152 T.C. No. 13

UNITED STATES TAX COURT

JAMES CLAY AND AUDREY OSCEOLA, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13104-11, 7870-13.　　　　　　　Filed April 24, 2019.

In these consolidated cases Ps are members of a Native
American tribe. During the years at issue the tribe operated a casino
on tribal land, owned communally by all members. The tribe made
regular distributions from casino revenue to each member. Ps
received these distributions and did not report them as income. R
determined that the distributions are taxable to Ps and, therefore, Ps
had unreported taxable income in the amounts of the distributions. R
also determined that Ps are liable for I.R.C. sec. 6662(a)
accuracy-related penalties.

Held: The distributions to Ps from casino revenue constituted
unreported taxable income to Ps.

Held, further, for purposes of I.R.C. sec. 6751(b), the Revenue
Agent Report (RAR) and the 30-day letter, to which the (RAR) was
attached, constitute the initial determination to assess penalties.

Held, further, R must show that written supervisory approval for penalties was obtained before the first formal communication to the taxpayer of the initial determination to assess penalties.

Held, further, the 30-day letter was the first formal communication to the taxpayer of the initial determination to assess penalties.

Held, further, R did not obtain written supervisory approval before the first formal communication of the initial determination to assess penalties and did not meet his burden of production for penalties under I.R.C. sec. 7491(c).

Robert O. Saunooke, for petitioners.

Sarah R. Bolen, Marissa R. Lenius, and Laura A. Price, for respondent.

PUGH, Judge: In notices of deficiency dated March 4, 2011, and January 10, 2013, respondent determined the following deficiencies and penalties:[1]

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2004 | $192,215 | $38,443 |
| 2005 | 310,171 | 62,034 |
| 2006 | 389,613 | 77,923 |

After concessions, the issues for decision are whether quarterly distributions, Christmas bonuses, and a miscellaneous payment to petitioners are income under section 61 for tax years 2004 through 2006 and whether petitioners are liable for accuracy-related penalties under section 6662(a) for tax years 2004 and 2005. These consolidated cases are lead cases for a larger group all with the common legal issue of the tax treatment of the distributions and Christmas bonuses (collectively, distributions).[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated in our findings by this reference. Petitioners James Clay and Audrey Osceola were residents of Florida when they timely filed their petitions.

---

[2] Sixteen related cases are bound by the outcome of these cases with respect to the taxability of the distributions. Those cases have been docketed under these numbers: 15157-10, 11729-11, 11750-11, 13105-11, 26196-11, 2805-12, 20038-12, 3157-13, 8075-13, 20287-13, 22976-13, 25476-13, 25815-13, 26518-13, 26748-13, and 27734-13.

## I.  The Miccosukee Tribe of Indians of Florida

The Miccosukee Tribe of Indians of Florida (Tribe) is a federally recognized tribe of Indians.  The Tribe's members ratified and adopted its constitution on December 17, 1961, and it was approved by the Department of the Interior (DOI) on January 11, 1962.  The constitution vests power and authority in the Miccosukee General Council (General Council), which includes all enrolled tribal members who are at least 18 years of age.  The General Council has four "Regular General Council Meetings" each year on the first Saturday of February, June, August, and November.  Meetings of the General Council other than Regular General Council Meetings are called "Special General Council Meetings".  Meetings of the General Council are recorded, transcribed, and approved by the General Council at the next meeting.

The Business Council controls the day-to-day operations of the Tribe, subject to the General Council's approval.  The Business Council has five members, each elected to a four-year term by the General Council:  the chairman, the assistant chairman, the secretary, the treasurer, and the lawmaker.  The Business Council meets regularly, and the chairman only votes in the case of a tie.  Billy Cypress served as chairman from 1987 through 2009 and was elected chairman again in 2016.  As a function of his position as chairman of the Tribe,

Mr. Cypress also acted as the Bureau of Indian Affairs (BIA) superintendent of the Tribe. The Tribe's primary operating bank account is its general account. All revenues not specifically allocated to another tribal account are deposited into this account, and the Tribe pays general operating expenses and capital improvement costs, among other expenses, from it.

### A. Tribal Sales Tax

The General Council enacted a tribal sales tax on November 7, 1984. It was approved by the DOI on December 13, 1984. It applied to sales of goods and services or lease rentals by any business operating on the Tribe's reservation; these include a gas station, a gift shop, a restaurant, a tourist village, and an air boat tour business. The tax was passed on to customers and was reflected on the customers' receipts. The small businesses were only modestly profitable, and the tribal sales tax collected was used primarily to pay for trash pickup. The Tribe deposited the tribal sales tax revenue into a separate tribal bank account, not its general account. The Tribe distributed tribal sales tax revenue to its members only once; each member received about $100.

### B. The Tribe's Casino

On April 7, 1989, the Tribe entered into a contract with Tamiami Development Corp. (TDC) to construct, manage, and operate a Class II gaming

facility for the Tribe called Miccosukee Indian Bingo and Gaming (Casino). The agreement, which was later assigned to Tamiami Partners, Ltd. (TLP), was approved by the DOI. TDC built the Casino on land it purchased outside but adjacent to the Tribe's reservation land. The purchased land was placed into trust for the Tribe. The Tribe has never allotted any of its lands to tribal members.

The Tribe has conducted gaming activities at the Casino since September 15, 1990. The General Council created the Miccosukee Tribal Gaming Authority on August 9, 1991. The Tribe's relationship with TLP ended amid dispute and litigation, and the Tribe has operated the Casino under the supervision of the Miccosukee Tribal Gaming Authority since October 13, 1993. It now owns and controls the Casino.

After receiving land and cash as part of a 1996 settlement with the State of Florida, the Tribe built a parking lot on a six-acre portion contiguous to the land on which the Casino is located. The parking lot is free for patrons of the Casino. The Tribe also owns and operates several enterprises related to the Casino, including a hotel, a concert hall, a food court, a restaurant, and a gift shop. The Casino and its related enterprises operate on a fiscal year ending on June 30 of each year.

C. Taxation of the Casino

The Tribe agreed to waive taxes on the Casino's gross revenue until TLP recouped its investment, and the Tribe imposed no taxes on the Casino from its opening in 1990 until 1995.  Effective January 1, 1995, the General Council imposed a 6.5% gross receipts tax on any amount received by the Casino, including wagers, admission fees, and the sales revenue of the Casino's related enterprises.  The gross receipts tax is treated as an above-the-line expense of the Casino and its related enterprises.  The Casino must estimate its gross receipts for each month on the last day of each month and pay the Tribe at least 90% of the tax on these gross receipts for that month using its estimate.  The Casino then has 15 days after the end of the month to calculate the actual gross receipts and gross receipts tax for that month; and if the actual gross receipts tax exceeds what the Casino previously paid, it must pay that excess.  The Casino receives a credit against future gross receipts tax if its estimate is greater than the actual gross receipts tax.

On February 27, 1995, after operations of the Casino were under the Tribe's control, Mr. Cypress directed the Tribe's finance director, Mike Hernandez, to open a checking account, called the nontaxable distribution revenue (NTDR) account, into which the Tribe would deposit the gross receipts tax revenue.  Mr.

Hernandez opened the NTDR account shortly thereafter, and the Tribe has deposited the gross receipts tax revenue into that account ever since. Most of the funds in the NTDR account came from the Casino although revenue from the Tribe's small businesses and land leases and easements was deposited there as well. What remained of the Casino's profits--after paying the gross receipts tax and other expenses--was deposited into the Tribe's general account.

D. Distributions

The Tribe has made quarterly per capita distributions since at least 1989. Until 1995 the Tribe distributed funds to its members from its general account. The largest sources of this revenue were the Tribe's small businesses, land leases for cattle grazing, hunting camps, pipelines, and cell towers. Distributions made before the opening of the Casino were around $100 per member per quarter. The distributions grew considerably with the Casino's success.

The Tribe has made quarterly distributions to its members from the NTDR account since it was opened in 1995. The date of the quarterly distributions and the number of enrolled members is set at General Council meetings. Only enrolled members of the Tribe can participate in General Council meetings and receive distributions. One must have at least one Miccosukee parent to be an enrolled member in the Tribe. The amount of the distributions each quarter is determined

by dividing the gross receipts tax revenue for that quarter by the number of enrolled members. Distributions to minor children generally go to their tribal member mother because the Tribe is matrilineal--membership in a clan within the Tribe is determined by a tribal member's mother--and the mother is generally the head of the household. The father generally receives only his distribution. The Tribe may deduct certain amounts from a member's quarterly distribution upon request or if the member participates in one of the Tribe's loan programs. The quarterly distributions to a tribal member for the years at issue--2004, 2005, and 2006--were as follows:

| Quarter | 2004 | 2005 | 2006 |
| --- | --- | --- | --- |
| First | $22,000 | $27,500 | $36,000 |
| Second | 23,000 | 32,000 | 40,000 |
| Third | 26,900 | 33,500 | 40,700 |
| Fourth | 27,600 | 33,500 | 41,700 |

Members could cash their distribution checks at any bank or at the tribal administration building for a 1% fee. At the encouragement of Mr. Cypress, most members chose to cash their quarterly distribution checks at the tribal administration building. The Tribe also opened investment accounts for its members with Smith Barney. These accounts allowed members to avoid certain

requirements imposed on financial institutions while investing their otherwise idle cash and made it easier to make payments on large purchases, such as cars. Not every member chose to open a Smith Barney account. Those who did could request to have a portion of their quarterly distributions deposited into their Smith Barney accounts.

The Tribe also has paid its members Christmas bonuses since at least 2002. Christmas bonuses were paid from the Tribe's general account through 2005. The Tribe began paying Christmas bonuses from the NTDR account in 2006 because it was concerned that it would have to issue tax forms for distributions to members from the general account. The gross receipts tax rate was increased to 8% in 2006 to fund Christmas bonuses. The Christmas bonuses for 2004, 2005, and 2006 were $5,500, $6,000, and $7,000, respectively.

E. The Tribe's Tax Position

The Tribe has maintained since 1995 that its distributions are not taxable to members and need not be reported on their income tax returns. In a memorandum dated January 24, 1995, Mr. Cypress advised Mr. Hernandez that the tribal attorney has assured him that the distributions should not be reported on members' tax returns. Mr. Cypress continued that "I expect you, and your staff, to prepare tax returns for the members of the Tribe in accordance with, and relying on, our

attorney's opinion." From 1995 through 2007 Mr. Cypress encouraged tribal

members to cash their quarterly distribution checks at the tribal administration

office and to omit quarterly distributions from credit applications to avoid inviting

scrutiny from the Internal Revenue Service (IRS). He told the General Council

that the tribal administration office denies knowledge of the quarterly distributions

when lenders call to verify them. During a Special General Counsel Meeting on

February 6, 2003, Mr. Cypress was recorded in meeting minutes as stating the

following:

> Business Council has repeatedly asked that they do not claim the
> NTDR money as income on the credit applications but tribal members
> continue to do this. By doing this, tribal members run the risk of
> eventually having IRS problems. They (IRS) will see the money
> reported on their credit applications and start to tax them on it. The
> tribe has this money categorized as a license tax item in order to
> avoid IRS problems for tribal members. But with the actions of tribal
> members, this is being compromised.

The minutes go on to state that

> Chairman Cypress explained how the distribution was set up to avoid
> the government/IRS taxing us on the funds. Our plans for the
> distribution were set up when we started the gaming operation. These
> plans were sent to BIA for their review and were approved by the
> Department of Interior. If these monies were classified as per capita
> payment to tribal members then IRS could tax us but we do not
> classify it as such. But due to the actions of maybe two or three tribal
> members, all tribal members could be affected.

The minutes for this meeting also record the following comments by another tribal officer, Assistant Chairman Jasper Nelson: "When tribal members are asked to not divulge NTDR money, it is for their own good. He stated by doing this, it will give IRS the opportunity to find out about the money and tax us on it. This would jeopardize the livelihood of tribal members who depend on this money."

Minutes of a Special General Council Meeting on February 10, 2005, record Mr. Cypress stating that

> there are members who share information with non-Indians about the money they receive from the Tribe. The consequences these members are faced with as well as putting the rest of the Tribe in this predicament, they cannot blame anyone but themselves as these are the reason why we repeatedly stressed to tribal members to keep information to themselves.

In several General Council meetings in 1999, 2003, and 2006, Mr. Cypress and the Tribe's legal counsel, Dexter Lehtinen, also discussed the tax treatment of the neighboring Seminole tribe's distributions. They warned that the Tribe would be required to withhold tax on its distributions, like the Seminoles, if tribal members did not follow their directions. But in one General Council meeting in 2006, Mr. Cypress and Mr. Lehtinen distinguished the Tribe's distribution scheme from the Seminoles', explaining that the Seminoles' distributions were taxed

because they were from net profits while the Tribe's distributions were nontaxable because they were from the gross receipts tax.

The Tribe requested a legal opinion in 2003 from its outside counsel, White & Case, on the taxability of the Tribe's distributions to its members and on the Tribe's compliance with the Indian Gaming Regulatory Act of 1988 (IGRA), Pub. L. No. 100-497, 102 Stat. 2467 (codified at 25 U.S.C. secs. 2701-2721 (2012)). This opinion stated that the distributions are taxable to tribal members. The Tribe opened a reserve account at or near the commencement of an IRS audit of the Tribe and the Casino around 2005. This reserve account was meant to prepare for the possibility that the Tribe would be required to make a payment to the IRS as part of a settlement on behalf of the Tribe relating to compliance with the IGRA or members relating to taxes on distributions.

## II. Petitioners' Distributions and Income Tax Returns

Ms. Osceola grew up on the reservation and went to elementary school there but stopped attending school after fifth grade. She was employed by several businesses around the reservation but had not been employed for over 20 years as of the time of trial. Mr. Clay grew up in a village outside the reservation. He never attended school and only became an enrolled member of the Tribe in 2005

to secure medical care for his mother.  Petitioners speak Miccosukee as their primary language and testified at trial with the help of an interpreter.

Petitioners received quarterly distributions for each of the years at issue determined by the number of enrolled members in their family.  Ms. Osceola received her distributions as well as those of her dependent children.  Her net distributions after deductions for housing and loan repayment--during the years in issue--were as follows:

| Distribution | 2004 | 2005 | 2006 |
|--------------|------|------|------|
| First quarter | $131,850 | $128,400 | $215,700 |
| Second quarter | 128,020 | 181,030 | 239,700 |
| Third quarter | 123,530 | 200,700 | 243,900 |
| Fourth quarter | 128,900 | 200,700 | 249,900 |
| Christmas bonus | 27,500 | 36,000 | 42,000 |

Ms. Osceola cashed her distribution checks at the tribal administration office during the years in issue.  She did not give each of her children their distributions after collecting them; rather, she kept them and spent them on family expenses as she determined necessary.  In addition to the distributions, Ms. Osceola received a

miscellaneous payment from the Tribe of $1,295 in 2006.[3] The Tribe made this payment out of the general account.

Mr. Clay did not receive distributions until he became an enrolled member of the Tribe in the second quarter of 2005. Mr. Clay received net distributions during the years at issue in the following amounts:

| Distribution | 2005 | 2006 |
|---|---|---|
| First quarter | --- | $36,000 |
| Second quarter | $32,000 | 40,000 |
| Third quarter | 33,500 | 40,700 |
| Fourth quarter | 33,500 | 41,700 |
| Christmas bonus | 6,000 | 7,000 |

Petitioners were married during the years at issue, and they filed a joint Form 1040, U.S. Individual Income Tax Return, for each of those years. Omar Barrera, an accountant in Gainesville, Florida, prepared petitioners' Forms 1040 for the years in issue. Petitioners reported five of their children as dependents for each of the years in issue for a total of seven exemptions. None of their dependent children filed income tax returns for the years at issue. Petitioners provided Mr.

---

[3] As a result of an error, respondent determined the deficiency for tax year 2006 after including a miscellaneous payment of $1,200 in the notice of deficiency rather than one of $1,295. Respondent concedes the $95 that was omitted in the notice of deficiency.

Barrera with Forms W-2G, Certain Gambling Winnings, for the years in issue for purposes of preparing their Forms 1040 and reported gaming income and losses on their Form 1040 for each year. However, petitioners did not report their quarterly distributions or Christmas bonuses on their Forms 1040 for the years in issue. Petitioners never disclosed their quarterly distributions or Christmas bonuses to Mr. Barrera, and he never advised them on the taxability of their distributions.

III. IRS Audit of Petitioners' Returns

In 2010 the IRS audited dozens of returns filed by members of the Tribe who received distributions, in addition to petitioners.[4] On or before August 4, 2010, Supervisory Revenue Agent Anita D. Gentry prepared a memorandum regarding the "Miccosukee Project" giving preliminary approval for accuracy-related penalties for substantial understatements of income tax in cases developed for members of the Tribe, to be placed behind penalty workpapers in each case file. On September 13, 2010, the agent examining petitioners' returns sent them a revenue agent report (RAR), Form 4549-A, Income Tax Discrepancy Adjustments, containing proposed adjustments for 2004 and 2005, along with Form 872, Consent to Extend the Time to Assess Tax. While the record does not include a

---

[4] As we explain infra Section IV, we are reopening the record to include certain exhibits relevant to respondent's penalty determination.

final copy of what was sent to petitioners (respondent states that the RAR is included as part of the notice of deficiency), the agent's notes indicate that there was a "30-day letter" giving petitioners the option to file a protest and request a conference before the IRS Office of Appeals (Appeals) within 30 days.[5]

On October 18, 2010, the agent sent the case to Ms. Gentry for review. Ms. Gentry spent between 5 and 15 minutes reviewing the case before approving the penalties that day. A Civil Penalty Approval Form dated August 22, 2010, and bearing the typewritten initials "AG" dated October 18, 2010, indicates that "Substantial Understatement" and "Other Accuracy Related" penalties were approved for 2004 and 2005. "Negligence" penalties were not approved for those years. Ms. Gentry based her review on an August 9, 2010, memorandum and calculations prepared by the agent recommending application of the six-year statute of limitations under section 6501(e) (because petitioners omitted more than 25% of their income), and photocopies of distribution checks to petitioners.

Respondent issued a notice of deficiency to petitioners on March 14, 2011, determining deficiencies and penalties for negligence and substantial

---

[5] The examining officer's activity record entry for October 18, 2010, after the expiration of the 30-day period, states: "Prepared case to send to review. Printed work papers, unagreed report and 90 day 886A". And the entry for March 11, 2011, states in part: "No protest. SND needs to be prepared for 2004 and 2005."

understatement of tax for tax years 2004 and 2005. Respondent issued a second notice of deficiency on January 10, 2013, determining deficiencies and penalties for negligence and substantial understatement for tax year 2006.

## OPINION

### I. Burden of Proof

Ordinarily, the burden of proof in cases before the Court is on the taxpayer. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a), in certain circumstances the burden of proof may shift from the taxpayer to the Commissioner. Petitioners have not claimed or shown that they meet the specifications of section 7491(a) to shift the burden of proof to respondent as to any relevant factual issue.

### II. Posttrial Briefing Issues[6]

#### A. Respondent's Motion To Strike

Rule 52 provides that the Court can strike from any brief "any insufficient claim or defense or any redundant, immaterial, impertinent, frivolous, or scandalous matter." Respondent requests that we strike from petitioners'

---

[6] We address each of petitioners' and respondent's motions to reopen the record with respect to our decision in Graev v. Commissioner (Graev III), 149 T.C. 485 (2017), supplementing and overruling in part Graev v. Commissioner (Graev II), 147 T.C. 460 (2016) infra Section IV.

simultaneous reply brief arguments relating to: (1) the "General Welfare

Doctrine" because petitioners conceded this issue before trial;[7] (2) the Per Capita

Act of 1983, Pub. L. No. 98-64, 97 Stat. 365 (codified at 25 U.S.C. secs. 117a-

117c (2012)) and the Indian Land Consolidation Act, Pub. L. No. 97-459, sec.

211, 96 Stat. at 2519 (codified at 25 U.S.C. sec. 2210 (2012)), because petitioners

abandoned these arguments by omitting them from their opening brief; and (3) two

documents petitioners rely on in support of their proposed findings and argument,

because they were not in evidence.

Motions to strike are generally disfavored by Federal courts. Estate of

Jephson v. Commissioner, 81 T.C. 999, 1001 (1983); Allen v. Commissioner, 71

---

[7] We will use the term the "General Welfare Doctrine" as shorthand for arguments relating to Rev. Rul. 2005-46, 2005-2 C.B. 120; Rev. Proc. 2014-35, 2014-26 I.R.B. 1110 (applicable in tax years for which the period of limitations under sec. 6511 had not expired); and the Tribal General Welfare Exclusion Act of 2014, Pub. L. No. 113-168, sec. 2(a), 128 Stat. at 1883 (codified as amended at sec. 139E, and applicable in tax years for which the period of limitations under sec. 6511 had not expired.) Tribal General Welfare Exclusion Act, sec. 2(d)(1), 128 Stat. at 1884.

Sec. 139E(a) provides that gross income does not include the value of any Indian general welfare benefit. Indian general welfare benefits include payments to and services provided to or on behalf of a member of an Indian tribe pursuant to an Indian tribal program. Sec. 139E(b). However, the income is only excluded if (1) the program is administered under specific guidelines and does not discriminate in favor of tribal leadership and (2) the benefits are available to any member who meets the guidelines, are for the promotion of general welfare, are not lavish or extravagant, and are not compensation for services. Id.

T.C. 577, 579 (1979). "A motion to strike should be granted only when the allegations have no possible relation to the controversy. When the court is in doubt whether under any contingency the matter may raise an issue, the motion should be denied." Estate of Jephson v. Commissioner, 81 T.C. at 1001 (quoting Samuel Goldwyn, Inc. v. United Artists Corp., 35 F. Supp. 633, 637 (S.D.N.Y. 1940)). In addition, if "the subject of the motion involves disputed and substantial questions of law, the motion should be denied and the allegations should be determined on the merits." Id. And "a motion to strike will usually not be granted unless there is a showing of prejudice to the moving party." Id.; see also Pony Creek Cattle Co. v. Great Atl. & Pac. Tea Co. (In re Beef Industry Antitrust Litigation), 600 F.2d 1148, 1168-1169 (5th Cir. 1979) ("[U]nnecessary evidentiary details are usually not stricken from the complaint unless prejudicial or of no consequence to the controversy[.]").

### 1. Issues Included in the Stipulation of Settled Issues

Our Rules require parties "to stipulate, to the fullest extent to which complete or qualified agreement can or fairly should be reached, all matters not privileged which are relevant to the pending case, regardless of whether such matters involve fact or opinion or the application of law to fact." Rule 91(a)(1). Before trial the parties filed a stipulation of settled issues stating that "petitioners

concede that the quarterly and Christmas distributions at issue in this case are not tax-exempt general welfare payments as described in Rev. Rul. 2005-46, 2005-2 C.B. 120; Rev. Proc. 2014-35, 2014-26 I.R.B. 1110; or I.R.C. § 139E." Our Rules are explicit about the binding nature of stipulations. "A stipulation shall be treated * * * as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties." Rule 91(e); see also Enis v. Commissioner, T.C. Memo. 2017-222, at *4, n.3. "The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires." Rule 91(e); Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1547 (9th Cir. 1987) ("A stipulation will generally be enforced unless manifest injustice would result."), aff'g T.C. Memo. 1986-23.

Petitioners have not shown any reason why we should release them from their stipulation. This is not a circumstance of a stipulated fact's being contradicted by other facts in the record. See, e.g., Jasionowski v. Commissioner, 66 T.C. 312 (1976). Rather this was a strategic decision before trial not to pursue an argument that then shaped the parties' trial presentations. In fact, counsel for petitioners even used the stipulation as a basis for objecting to questions asked by respondent's counsel, stating at trial that "this is not a general welfare case." It

would be prejudicial to allow petitioners to duck questions at trial about an issue on the basis that they have abandoned it, only to revive the dispute on brief. However, as we discuss infra Section III.A, we are not the first court to consider this issue. The U.S. Court of Appeals for the Eleventh Circuit, to which these cases are appealable absent stipulation to the contrary, see sec. 7482(b), has ruled that section 139E does not provide a tax exemption for the distributions, see United States v. Jim, 891 F.3d 1242 (11th Cir. 2018); see also Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). Whether we deem petitioners to have abandoned the argument, strike the argument, or decide it on its merits following the U.S. Court of Appeals for the Eleventh Circuit, their argument is unavailing. We therefore will deny respondent's motion as to this issue and reject it on its merits.

### 2. Issues Not Raised in Petitioners' Opening Brief

We may consider an issue raised for the first time in a party's answering brief to be abandoned and conceded. See Dutton v. Commissioner, 122 T.C. 133, 142 (2004) ("Our practice is not to consider new issues raised for the first time in an answering brief."); Krause v. Commissioner, 99 T.C. 132, 177 (1992), aff'd sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). Petitioners did not raise the Per Capita Act of 1983 in their pretrial memorandum, at trial, or in

their opening brief and, while they raised the Indian Land Consolidation Act in their pretrial memorandum, they did not raise it again until their reply brief. We therefore could deem petitioners to have abandoned arguments based on the Per Capita Act of 1983 and the Indian Land Consolidation Act. See Dutton v. Commissioner, 122 T.C. at 142; Krause v. Commissioner, 99 T.C. at 177. However, as we explain infra Section III. B and C, they do not provide a tax exemption for the distributions. We therefore will deny as moot respondent's motion as to these arguments.

### 3. Documents Not in Evidence

Petitioners rely on two documents not in evidence in their opening and reply briefs: a 1989 contract between the Tribe and TDC and a 1995 letter from the Tribe to the BIA's acting director, Frank Keel. Tacitly conceding that they cannot rely on facts not in evidence, petitioners counter respondent's motion to strike these two documents and petitioners' arguments based on them by moving to reopen the record to admit them into evidence. They argue that these documents should be admitted to "clarify and confirm testimonial evidence received by the Court at trial" and respond to issues raised by respondent in his opening brief.

The decision to reopen the record to admit additional evidence is within our broad discretion. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321,

331-332 (1971); Butler v. Commissioner, 114 T.C. 276, 286-287 (2000), abrogated on other grounds, Porter v. Commissioner, 132 T.C. 203 (2009); see also SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir. 1986) (citing Zenith Radio Corp., 401 U.S. at 332), overruled on other grounds, Pinter v. Dahl, 486 U.S. 622 (1988). The Court of Appeals for the Eleventh Circuit considers four factors in determining whether to reopen the record: (1) the timeliness of the motion to reopen the record, (2) the character of the testimony to be offered, (3) the effect of granting the motion to reopen to record, and (4) the reasonableness of the request to reopen the record. United States v. Byrd, 403 F.3d 1278, 1284 (11th Cir. 2005); Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. ___, ___-___ (slip op. at 10-11) (May 7, 2018).

The third factor--the effect of reopening the record--is most relevant here. We will not reopen the record to admit these documents because we find that they are cumulative and would not change the outcome of the case. They do not bear on the outcome of either of the issues in this case: whether the distributions are taxable to petitioners and whether petitioners are liable for accuracy-related penalties. Therefore we will deny petitioners' motion to reopen the record to

admit these two documents and will grant respondent's motion to strike those portions of petitioners' brief that rely on them.[8]

B. Petitioners' Motion To Amend the First Stipulation of Facts

Petitioners also move to amend four paragraphs of the first stipulation of facts to correct what they contend are factual errors. We may amend a stipulation when "to accept * * * [the unamended stipulation] would have been manifestly unjust or if the evidence contrary to the stipulation was substantial." Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1232 (5th Cir. 1978); see Rule 91(e). Petitioners' proposed amendments are belated wording tweaks to bolster their posttrial arguments and do not change our conclusions on the legal issues before us. In addition, petitioners have not identified any manifest injustice or

---

[8] In violation of Rule 151(e)(3), petitioners' opening brief does not cite, in support of their proposed findings of fact, any evidence that was admitted. This is surprising especially because at the end of trial we discussed posttrial briefs with the parties. Nor did their reply brief comply with our Rules. Thus, these posttrial briefing issues appear to be part of a pattern of disregarding our Rules. Lack of familiarity with this Court and lack of resources are unappealing excuses for failure to read and comply with our Rules and are no excuse for failure to heed discussions with the Court on the record with a transcript to remind the parties of those discussions. Brewer Quality Homes, Inc. v. Commissioner, T.C. Memo. 2003-200, 2003 WL 21545886, at *1 n.3 ("[Petitioners'] counsel is put on notice that (1) the Rule is designed both to facilitate the work of the Court and also to provide a 'level playing field' to the parties, and (2) the Court will be inclined to impose formal sanctions in the event of future similar violations."), aff'd, 122 F. App'x 88 (5th Cir. 2004).

substantial evidence that contradicts the stipulations they seek to amend.

Therefore, we will deny their motion to amend the first stipulation of facts.

III.  Taxability of Distributions to Tribal Members

Section 61 provides that "gross income means all income from whatever source derived" unless an exception is provided.  The Supreme Court stated that gross income comprises all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion."  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  Individual tribal members are subject to Federal income taxation unless a treaty or an Act of Congress provides an exemption. Squire v. Capoeman, 351 U.S. 1, 6 (1956).  An exemption from income tax must be clearly expressed.  Id.; Holt v. Commissioner, 44 T.C. 686, 690 (1965), aff'd, 364 F.2d 38 (8th Cir. 1966).  We cannot create a tax exemption by implication. Hoptowit v. Commissioner, 78 T.C. 137, 142 (1982), aff'd, 709 F.2d 564 (9th Cir. 1983); Jourdain v. Commissioner, 71 T.C. 980, 990 (1979), aff'd, 617 F.2d 507 (8th Cir. 1980).

The parties first dispute whether the distributions are made from net gaming revenues taxable under the IGRA.  The IGRA provides that as a condition of making per capita payments to tribal members out of net gaming revenues from a Class II gaming facility, "the per capita payments are subject to Federal taxation

and tribes notify members of such tax liability when payments are made." 25 U.S.C. sec. 2710(b)(3)(D). Petitioners argue that the distributions are from leases of land (and also, as noted above, that they are exempt from tax under the General Welfare Doctrine). Irrespective of whether the distributions come from net gaming revenues or leasing revenues, if petitioners can identify no exception from gross income, then they are taxable. We do not find any real dispute between the parties on the facts, although the parties strongly disagree over how to characterize the source of these distributions.

A. IGRA

We are not the first court to consider petitioners' arguments that the distributions are not net gaming revenues and that the General Welfare Doctrine exempts them from taxation.[9] The U.S. Court of Appeals for the Eleventh Circuit recently ruled on a case regarding the taxability of distributions to another member of the Miccosukee Tribe, Sally Jim. Jim, 891 F.3d 1242. In that case, the Government moved for summary judgment that the distributions to Ms. Jim, which were derived from gaming proceeds, were not exempt from taxation as general

---

[9] As noted above, before trial, petitioners conceded that the distributions were not general welfare payments.

welfare payments or income from the land.  United States v. Jim, No. 14-22441, 2016 WL 6995455 (S.D. Fla. Aug. 19, 2016).  The Tribe intervened.

The District Court granted the Government's summary judgment motion in part but held that material disputes of fact remained over how much of the distribution was from nongaming revenue and whether Ms. Jim was taxable on the entire distribution, including the amounts she received that were attributable to her family members.  After a bench trial, the court concluded that no exemption applied to the income.  Id.

On appeal, the Court of Appeals affirmed that section 139E does not exempt per capita payments from gaming revenue designated as taxable by the IGRA. Jim, 891 F.3d 1242.  It also rejected the argument that the distributions were out of gross revenue, not net revenue, and therefore were not subject to the IGRA.[10]  Id. at 1250 n.17.  And it quickly rejected the argument that the distributions were exempted from tax by the Miccosukee Settlement Act of 1997 (Miccosukee

_____

[10] Even accepting petitioners' claim that the gross receipts tax is a continuation of the tribal sales tax adopted in 1984, as the Court of Appeals concluded, the gross receipts tax still is a mechanism for collecting gaming revenue from the Casino to fund per capita distributions to members eligible for no other exception to the definition of gross income, as we explain below.  See United States v. Jim, 891 F.3d 1242, 1250 n.17 (11th Cir. 2015).  We similarly reject petitioners' argument that distributions are not taxable because they were not out of net gaming revenue but rather were out of gross revenue.

Settlement Act), Pub. L. 105-83, sec. 707(c), 111 Stat. at 1624 (codified at 25 U.S.C. secs. 1750-1750e(c) (2006)). <u>Jim</u>, 891 F.3d at 1250 n.17.

We see no factual distinctions between the distributions to petitioners and to Ms. Jim and therefore hold that the distributions to petitioners are taxable under the IGRA.

B.  Petitioners' Other Statutory Arguments

Petitioners made other arguments that were not considered (or were considered only briefly) by the Court of Appeals.  Petitioners point to three Acts of Congress that they maintain exempt the Tribe's distributions from Federal income taxation:  the Miccosukee Settlement Act; the Act of Oct. 17, 1975, Pub. L. No. 94-114, sec. 6, 89 Stat. at 579 (codified at 25 U.S.C. sec. 459e (2006));[11] and the Indian Land Consolidation Act.[12]  None of these provisions would exempt the distributions from the IGRA.  And even were we to conclude that the distributions were not out of net gaming revenue, none of those provisions apply

---

[11] 25 U.S.C. sec. 459e has been reclassified as sec. 5506 of the same title.

[12] Petitioners take the position that no agency other than the BIA has any authority to interpret or apply Federal law, treaties, or other matters arising out of Indian affairs, including the taxation of the tribes and their members.  Petitioners cite no cases, nor did we find any support for such a broad interpretation of the authority given to the BIA by statute.  And certainly a statutory grant of authority to the BIA to interpret the statutes could not supplant our role or the role of other courts to interpret and apply these provisions.

to the land on which the Casino is located and, therefore, none exempt the distributions from Federal income tax.

The Miccosukee Settlement Act is the codification of the effects of the Tribe's 1996 settlement agreement with the State of Florida as it relates to the Federal Government. The Miccosukee Settlement Act sec. 707(c)(1)(A) addresses the tax effects of the settlement agreement, providing in relevant part that no money or land paid or conveyed to the Tribe "under this Act or the Settlement Agreement shall be taxable under Federal or State law." Petitioners contend that Miccosukee Settlement Act sec. 707(c) makes all of the Tribe's land tax exempt. However, the plain wording of the provision limits its application to "lands conveyed to the Miccosukee Tribe under this part or the Settlement Agreement". The Casino is not located on any of the land that the Tribe received in the settlement agreement. Therefore, the Miccosukee Settlement Act does not provide an exemption from tax for petitioners' distributions.[13]

Petitioners also contend that 25 U.S.C. sec. 459e exempts their distribution from taxation. That section provides a tax exemption to any land conveyed pursuant to subchapter IV of title 25, which relates to the conveyance of

---

[13] While the Miccosukee Settlement Act may apply to the land on which the parking lot is built, the Tribe does not charge a fee for use of the parking lot so the parking lot does not provide another revenue source for the distributions.

submarginal land to Indian tribes. 25 U.S.C. secs. 459-459e. It provides that any land conveyed to Indian tribes under that subchapter and any distribution of gross receipts derived from those lands are exempt from Federal, State, and local taxation. Id. sec. 459e. And 25 U.S.C. sec. 459a provides a list of the specific properties conveyed under that subchapter to specific tribes but the Tribe is not included in that list. Thus, 25 U.S.C. sec. 459e does not apply to the land on which the Casino is located and does not exempt petitioners' distributions from tax.

Finally, petitioners contend that the Indian Land Consolidation Act provides a tax exemption for the distributions.[14] The Indian Land Consolidation Act allows Indian tribes to enter into a "land consolidation plan providing for the sale or exchange of any tribal lands or interest in lands for the purpose of eliminating undivided fractional interests in Indian trust or restricted lands or consolidating its tribal land holdings". Id. sec. 2203(a). Title 25 U.S.C. sec. 2210 provides that land or interests in land acquired by the Federal Government for an Indian or an Indian tribe as part of a consolidation plan under the Indian Land Consolidation Act is exempt from Federal, State, and local taxation. The Casino is located on

_____

[14] As noted above, petitioners raised this argument only in their reply brief, and respondent argues petitioners should be deemed to have abandoned it.

land purchased by TDC and placed into trust for the Tribe; there is no evidence that the land or an interest in the land was acquired as part of a consolidation plan under the Indian Land Consolidation Act. Thus, 25 U.S.C. sec. 2210 does not apply to the Tribe's land and does not exempt the distributions from tax.

Petitioners are correct that to the extent possible we resolve ambiguities in treaties and statutes in favor of Indians and construe Indian treaties in the sense in which the Indians understood them. See Capoeman, 351 U.S. at 6-7; Choctaw Nation of Indians v. United States, 318 U.S. 423, 432 (1943). However, this rule of construction "comes into play only if such statute or treaty contains language which can reasonably be construed to confer income exemptions." Holt v. Commissioner, 364 F.2d at 40. This is not the case with the three provisions to which petitioners have pointed. "We are not free to create, by implication, a tax exemption for petitioner[s]." Hoptowit v. Commissioner, 78 T.C. at 142. Furthermore, we do not agree with petitioners' contention that we must accept Mr. Cypress' interpretation of these statutes as he was the BIA Superintendent, regardless of whether or to what extent he is a delegate of the Secretary of the Interior.[15]

---

[15] Petitioners have not presented any evidence that Mr. Cypress was delegated any authority by the Secretary of the Interior by virtue of his position as

(continued...)

C. Distributions Not Directly Derived From the Land

Petitioners next contend that the distributions are exempt from Federal tax because they are derived directly from tribal lands. They base this argument on Capoeman and on the Per Capita Act of 1983 and/or the Land Consolidation Act (which we addressed above).[16] The Supreme Court held in Capoeman, 351 U.S. at 10, that the General Allotment Act provided the noncompetent Indian[17] taxpayer an exemption for proceeds directly derived from his allotted parcel of reservation land--in that case, proceeds from the sale of standing timber on his allotment. Here, the Tribe has not made any allotments of land to its members. See Fry v.

---

[15](...continued)
superintendent. Even if we assume that the Secretary of the Interior has delegated Mr. Cypress some authority, we are not bound to his informal interpretations of the statutes and regulations concerning the Tribe and Indians more generally. Moreover, his interpretations of these statutes are contradicted by the statutes' plain meaning, and we do not find them to be persuasive.

[16] Again, this is an argument that petitioners raised only in their reply brief, and respondent argues petitioners should be deemed to have abandoned it.

[17] A noncompetent Indian, in this context, is a member of a tribe who received an allotment of land that is held in trust for him or her by the Federal Government and who, under the terms of General Allotment Act, was prohibited from alienating or encumbering the land with the Federal Government's consent. Hoptowit v. Commissioner, 78 T.C. 137, 138 n.2 (1982), aff'd, 617 F.3d 507 (8th Cir. 1980).

United States, 557 F.2d 646, 648 (9th Cir. 1977); Perkins v. Commissioner, 150 T.C. __, (slip op. at 14) (Mar. 1, 2018); Holt v. Commissioner, 44 T.C. at 691.

The Per Capita Act of 1983 permits tribes to make to members per capita payments of funds held in trust by the Secretary of the Interior. 25 U.S.C. sec. 117a. Per capita distributions made under the Per Capita Act of 1983 are exempt from Federal and State tax. Id. sec. 117b(a) (referencing the Act of Oct. 19, 1973, Pub. L. No. 93-134, sec. 7, 87 Stat. at 468). However, not all per capita distributions qualify for the Per Capita Act's tax exemption; the funds must come from approved sources and be distributed from qualifying accounts. 25 C.F.R. secs. 115.701-703 (2001). Petitioners argue that the NTDR account is a qualifying account and the gross receipts tax revenue is an approved source, specifically that it was derived directly from tribal lands.

The U.S. Court of Appeals for the Eleventh Circuit already has concluded that the Tribe's distributions to members come "from 'investment in . . . improvements' on the land and 'business activities related to those assets,' namely gambling" and "therefore * * * [do] not derive directly from the land." Jim, 891 F.3d at 1250 n.17 (citations omitted; alteration in original). And we have held that income derived from a business on reservation land was not necessarily derived directly from the land. Hoptowit v. Commissioner, 78 T.C. at 145. We have

limited our definition of income derived directly from the land to income earned through "exploitation of the land itself". Cross v. Commissioner, 83 T.C. 561, 566 (1984), aff'd sub nom. Dillon v. United States, 792 F.2d 849 (9th Cir. 1986); see also Stevens v. Commissioner, 452 F.2d 741 (9th Cir. 1971) (holding that income from farming and ranching on taxpayer's allotted land is tax exempt), aff'g in part and rev'g in part 52 T.C. 330 (1969); Rickard v. Commissioner, 88 T.C. 188, 192 (1987) (holding that farming income on taxpayer's allotted land is tax exempt).

Our definition does not include income earned by use of the land along with capital assets and labor. Cross v. Commissioner, 83 T.C. at 566 (holding that income from operating a smokeshop on reservation land was not directly derived from the land); see also Critzer v. United States, 597 F.2d 708, 713-714 (Ct. Cl. 1979) (holding that neither income from operation of a motel, restaurant, gift shop, and apartment complex nor income from leases of buildings is directly derived from the land); Hoptowit v. Commissioner, 78 T.C. at 145 (holding that income from operating a smokeshop on reservation land was not directly derived from the land); Beck v. Commissioner, T.C. Memo. 1994-122 (holding that rental income from an apartment complex on tribal land is not derived directly from the land), aff'd, 64 F.3d 655 (4th Cir. 1995); Tonasket v. Commissioner, T.C. Memo. 1985-

365 (holding that income from operating a smokeshop on the taxpayer's allotted land was not directly derived from the land).

We also have held that per capita payments of casino revenue are not directly derived from the land merely by virtue of the casino's location on tribal land. Doxtator v. Commissioner, T.C. Memo. 2005-113, 2005 WL 1163978, at *9; Campbell v. Commissioner, T.C. Memo. 1997-502, 1997 WL 690178, at *4 (holding that income from the operation of a casino on tribal land was not derived directly from the land), aff'd and remanded, 164 F.3d 1140 (8th Cir. 1999).

Petitioners argue that the distributions are directly derived from the land because they are, in substance, their share of rental payments that the Tribe receives for leasing Tribal land--owned communally by all members--to the Casino. They cite Rev. Rul. 56-342, 1956-2 C.B. 20, as support for their contention that their distributions are nontaxable. The revenue ruling lists "rentals (including crop rentals)" as income the IRS understands to be exempt as directly derived from the land under Capoeman. Id. But whether payments "'were in fact rent instead of something else paid under the guise of rent' * * * is a question of fact to be resolved on the basis of all the facts and circumstances." K & K Veterinary Supply, Inc. v. Commissioner, T.C. Memo. 2013-84, at *26-*27

(quoting Place v. Commissioner, 17 T.C. 199, 203 (1951), aff'd, 199 F.2d 373 (6th Cir. 1952)).

We are not bound by a revenue ruling, but even if we found its analysis persuasive, the record does not support petitioners' recharacterization of the gross receipts tax as rent payments that fall outside the IGRA. See Webber v. Commissioner, 144 T.C. 324, 352-353 (2015) ("We are not bound by revenue rulings; under Skidmore, the weight we afford them depends upon their persuasiveness and the consistency of the Commissioner's position over time."). There is no written lease between the Tribe and the Casino, and the 1995 gross receipts tax ordinance makes no mention of a lease or the use of tribal land. Nor have we found any reference to a lease from the Tribe to the Casino in any of the General Council meeting minutes in the record.

To the contrary, the evidence in the record illustrates the Tribe's intention that the gross receipts tax be a tax rather than rent payments. The 1995 gross receipts tax ordinance "declared * * * the intent of the Miccosukee Tribe of Indians of Florida that the * * * Miccosukee Indian Bingo & Gaming (MIBG ) * * * shall be subject to a gross receipts tax." And if we regard the 1995 gross receipts tax as an application of the 1984 tribal sales tax to the Casino, the 1984 ordinance states that the Tribe is imposing the tax under its authority "to levy and

collect assessments".  In each the Tribe's financial statements for fiscal years 1995 through 2002, the gross receipts tax revenue is listed under the section "Owners Compensation Fees" rather than with the Tribe's leases.  Finally, each of the Casino's financial statements from fiscal years 1995-1996 through 2005-2006 states that while the Casino is on the Tribe's land, "[n]o rental payment is currently required for the use of such land."

Petitioners have not shown that they are entitled to a tax exemption with respect to their distributions.  Petitioners have not introduced any evidence or made any argument concerning the inclusion of the $1,200 miscellaneous payment to Ms. Osceola in 2006 in her gross income.  And none of petitioners' arguments address the Christmas bonuses for 2004 and 2005, which were paid out of the Tribe's general account.  Therefore, we also sustain respondent's determination that the Christmas bonuses and Ms. Osceola's miscellaneous payment are taxable under section 61.

Concluding that the Tribe's distributions are taxable to petitioners does not call into question the Tribe's sovereign authority to impose tax; nor does the Tribe's sovereign authority affect our analysis of the taxability of the distributions. That depends on the law and whether any exceptions to taxability apply.

IV. Underpayment Penalties

Section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20% of the portion of an underpayment of tax required to be shown on the return that is attributable to "negligence or disregard of rules or regulations" and/or a "substantial understatement of income tax." Negligence includes "any failure to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). An understatement of income tax is a "substantial understatement" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d). In the notices of deficiency, respondent determined both the negligence penalty and the substantial understatement penalty.

The Commissioner bears the burden of production with respect to an individual taxpayer's liability for a penalty and is required to present sufficient evidence showing that the penalty is appropriate. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). To meet this burden for the substantial understatement penalty, the Rule 155 computations must confirm a substantial understatement. Sec. 7491(c). The Commissioner must also show that he complied with the procedural requirements of section 6751(b)(1). See sec. 7491(c); Graev v. Commissioner (Graev III), 149 T.C. 485, 492-493 (2017), supplementing and overruling in part Graev v. Commissioner (Graev II), 147 T.C.

460 (2016). Once the Commissioner meets his burden of production, the taxpayer bears the burden of proving that the Commissioner's determination is incorrect. Higbee v. Commissioner, 116 T.C. at 446-447.

A. Section 6751(b) Motions

Trial of this case was held, and the record was closed, before the issuance of our Opinion in Graev III. After the Court's decision in Graev III, we ordered respondent to file a response addressing the effect of section 6751(b) on these cases and directing the Court to any evidence of section 6751(b) supervisory approval in the record, and petitioners to respond. Respondent was unable to direct the Court to any evidence in the record that satisfies his burden of production with respect to section 6751(b)(1) and filed a motion to reopen the record to include two Civil Penalty Approval Forms accompanied by declarations from Ms. Gentry, one for both the 2004 and 2005 tax years and one for the 2006 tax year.

Petitioners did not oppose respondent's motion, but in their response they asked that they be "also given the opportunity to reopen the record to call witnesses who prepared and/or signed the declarations and penalty approval forms, or introduce other evidence bearing on the validity of such declarations and

forms." They also raised issues with the documents respondent proffered in support of his compliance with section 6751(b).

We granted petitioners' request to conduct additional discovery regarding respondent's compliance with section 6751(b), including interrogatories. After that discovery, petitioners moved to reopen the record to include certain additional documents relating to respondent's review of the penalties, namely Ms. Gentry's August 4, 2010, memorandum, the agent's August 9, 2010, memorandum regarding the six-year statute of limitations, the agent's activity log, and respondent's responses to petitioners' interrogatories. Respondent did not oppose that motion. We therefore will grant these two motions to reopen the record to admit evidence pertaining to 2004 and 2005. The parties also filed a stipulation of settled issues in which respondent conceded that he could not meet his burden of production as to the negligence penalty for 2004 and 2005, and that petitioners are not liable for the accuracy-related penalty for 2006. We therefore will deny respondent's motion as to evidence relating to penalty approval for 2006.

B. Petitioners' Section 6751(b) Arguments

Petitioners argue that (1) the supervisory approval for the 2004 and 2005 substantial understatement penalties was not timely and (2) the supervisor's review itself was not meaningful. Section 6751(b)(1) generally provides that no

penalty shall be assessed unless the Commissioner shows that "the initial determination" of the assessment was "personally approved (in writing) by the immediate supervisor of the individual making such determination". The U.S. Court of Appeals for the Second Circuit held in Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42, that written approval is required no later than the issuance of the notice of deficiency rather than the assessment of the tax. In so holding, the court noted the ambiguity in the statute, as the IRS cannot determine an assessment. Id. at 218; see also Graev II, 147 T.C. at 512 (Gustafson, J., dissenting) ("One can determine whether to make an assessment, but one cannot 'determine' an 'assessment'."). Because Congress enacted section 6751(b) to ensure that "penalties should only be imposed where appropriate and not as a bargaining chip", Chai v. Commissioner, 851 F.3d at 219 (quoting S. Rept. No. 105-174, at 65 (1998), 1998-3 C.B. 537, 601), and because the taxpayer decides whether to petition the Tax Court after receiving the notice of deficiency, the court held that the IRS must obtain supervisory approval no later than the date the IRS issues the notice of deficiency, Chai v. Commissioner, 831 F.3d at 221. But left open was the question we face: whether approval can come after the agent sends the taxpayer proposed adjustments that include penalties. In other words, must an agent secure penalty approval before

sending to the taxpayer written notice that penalties will be proposed, in this case in the form of a notice of proposed adjustment that gives the taxpayer right to appeal the proposed penalties with Appeals.

Petitioners argue that the initial determination of a penalty is "the first time an IRS official introduced the penalty into the conversation". See Graev III, 149 T.C. at 500, 501 (Lauber, J., concurring). They contend that the RAR contained the first suggestion of penalties, making the RAR--and not the notice of deficiency--the initial determination.

The RAR is the report sent to the taxpayer "indicating the adjustments to income as reported on the return and the nature of the adjustments * * * [the revenue agent] proposes to make." Branerton Corp. v. Commissioner, 64 T.C. 191, 194-195 (1975). When a 30-day letter is sent, the taxpayer may protest those adjustments at Appeals and a notice of deficiency may follow if the taxpayer does not protest the adjustments (or if the taxpayer and Appeals do not settle). See secs. 601.105(d), 601.106(b), Statement of Procedural Rules. The notice of deficiency is the means by which the Commissioner notifies the taxpayer that he has determined a deficiency. Sec. 6212(a). Once the IRS determines a deficiency, including any penalties, the IRS can assess that deficiency unless the taxpayer timely petitions this Court for redetermination of that liability. See sec. 6213(a).

The determinations made in a notice of deficiency typically are based on the adjustments proposed in an RAR. See Branerton Corp. v. Commissioner, 64 T.C. at 194-195; Globe Tool & Die Mfg. Co. v. Commissioner, 32 T.C. 1139, 1141 (1959) ("[R]espondent sent to petitioner by registered mail a notice of deficiency determining deficiencies in income tax for the taxable years 1951 and 1952.  * * * Said determination by respondent was based on the adjustments contained in the revenue agent's report[.]"); Fitzner v. Commissioner, 31 T.C. 1252, 1255 (1959) ("[I]t is obvious that petitioner * * * is relying upon the revenue agent's report of examination upon which respondent based his determination of deficiency."). And when those proposed adjustments are communicated to the taxpayer formally as part of a communication that advises the taxpayer that penalties will be proposed and giving the taxpayer the right to appeal them with Appeals (via a 30-day letter), the issue of penalties is officially on the table.  See Palmolive Bldg Inv'rs, LLC v. Commissioner, 152 T.C. __, __ (slip op. at 20-23) (Feb. 28, 2019) . Therefore, we conclude that the initial determination for purposes of section 6751(b) was made no later than September 13, 2010, when respondent issued the RAR to petitioners proposing adjustments including penalties and gave them the right to protest those proposed adjustments.

Next we consider when Ms. Gentry approved these penalties. Respondent does not contend that, nor do we consider whether, Ms. Gentry's August 4, 2010, memorandum satisfies his burden; he directed us to the penalty approval form initialed by Ms. Gentry on October 18, 2010. We therefore hold that Ms. Gentry approved the penalty determinations for 2004 and 2005 on October 18, 2010--after the initial determination of proposed penalties had been communicated to petitioners--and therefore supervisory approval was not timely under section 6751(b).

Because we hold that respondent did not timely obtain written supervisory approval, we need not reach petitioners' second argument that Ms. Gentry failed to conduct a meaningful review.

Any contentions we have not addressed we deem irrelevant, moot, or meritless.

To reflect the foregoing,

Appropriate orders will be issued, and decisions will be entered under Rule 155.