[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17109
_____

D.C. Docket No. 1:14-cv-22441-CMA


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

SALLY JIM,

Defendant - Appellant,

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,

Intervenor - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 4, 2018)

Before TJOFLAT and JORDAN, Circuit Judges, and STEELE, District Judge.[*]

TJOFLAT, Circuit Judge:

In 1988, Congress enacted the Indian Gaming Revenue Act ("IGRA"), Pub. L. No. 100-497, 102 Stat. 2467 (1988) (codified at 25 U.S.C. § 2701 *et seq.*), "to protect the Indian gaming industry from corruption and to provide for extensive federal oversight of all but the most rudimentary forms of Indian gaming," *Tamiami Partners, Ltd. By & Through Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla.*, 63 F.3d 1030, 1033 (11th Cir. 1995). IGRA permits an Indian tribe to engage in gaming and to distribute the revenue from gaming activities to its members on a per capita basis—that is, an equal payment to each member. 25 U.S.C. § 2710(b)(1), (b)(3). When an Indian tribe decides to distribute the revenue from gaming activities, however, the distributions are subject to federal taxation. *Id.* § 2710(b)(3)(D). The Indian tribe, as a consequence, must report the distributions, notify its members of their tax liability, and withhold the taxes due on them. *Id.* § 2710(b)(3)(D); 26 U.S.C. §§ 3402(r)(1), 6041(a).

In the case before us, an Indian tribe engaged in gaming activities. Each quarter, the tribe used the revenue of the gaming activities to fund per capita distributions to its members. But the tribe disregarded its tax obligations on these distributions. It neither reported the distributions nor withheld taxes on them.

---

[*] Honorable John E. Steele, United States District Judge for the Middle District of Florida, sitting by designation.

2

In 2001, a member of the tribe received distributions on behalf of herself, her husband, and her two daughters.  She neither filed a tax return for the 2001 tax year nor paid federal taxes on the distributions.  The Government, after catching wind of the tribe's distribution program, assessed taxes, penalties, and interest against the member for the distributions.  The member did not pay the assessments.

As a result, the Government brought suit to reduce the tax assessments to a judgment in district court.  The tribe moved to intervene as of right[1] because the case required a determination as to the taxability of the distributions, which could impair its distribution program and subject it to reporting and withholding requirements.  Its motion was granted, and the tribe filed an answer and affirmative defenses.

In the proceedings below, the member and the tribe raised as an affirmative defense that the distributions were exempt from taxation as "Indian general welfare benefit[s]" under the Tribal General Welfare Exclusion Act ("GWEA"), Pub. L. No. 113-168, 128 Stat. 1883 (2014) (codified at 26 U.S.C. § 139E).  GWEA excludes from federal taxation "any payment made or services provided to or on behalf of a member of an Indian tribe . . . pursuant to an Indian tribal government

---

[1] *See* Fed. R. Civ. P. 24(a).

3

program."[2]  26 U.S.C. § 139E(b).  The Government moved for summary judgment

on this defense.  On summary judgment, the District Court determined that "the

Tribal GWE Act was not meant to supplant the IGRA; that is, per capita

distributions of gaming revenue remain taxable income, even if these distributions

arguably promote the general welfare of a tribe."

In this appeal, the member and the tribe contend that the District Court erred

in concluding that the exemption for Indian general welfare benefits did not apply

to the distributions.[3]  The tribe alone asserts that the District Court erroneously

upheld tax penalties against the member and incorrectly attributed to the member

the distributions of her husband and daughters.  Lastly, the tribe argues that the

District Court erred by entering judgment against it as an intervenor.

We affirm the ruling of the District Court in each of these matters.  The

distribution payments cannot qualify as Indian general welfare benefits under

---

[2] To qualify for this exemption, the Indian tribal government program must meet the following requirements:

> (1) the program is administered under specified guidelines and does not discriminate in favor of members of the governing body of the tribe, and

> (2) the benefits provided under such program--

>> (A) are available to any tribal member who meets such guidelines,

>> (B) are for the promotion of general welfare,

>> (C) are not lavish or extravagant, and

>> (D) are not compensation for services.

26 U.S.C. § 139E(b)(1)–(2).

[3] The member and the tribe raise two arguments in the alternative that are wholly lacking in merit.  *See infra* note 17.

GWEA because Congress specifically subjected such distributions to federal taxation in IGRA.  The member has waived any arguments as to penalties or the amount assessed against her, and the tribe lacks a legal interest in those issues. The District Court did not err in entering judgment against the tribe because the tribe intervened as of right and the Government sought to establish its obligation to withhold taxes on the distributions.

## I.

## A.

In 1990, the Miccosukee Indian Tribe of Florida ("Tribe"), an Indian tribe recognized under the Indian Reorganization Act of 1934, Pub. L. No. 73-383, 48 Stat. 984 (1934), began to operate a gaming facility called Miccosukee Indian Bingo and Gaming ("MIBG") on its reservation lands in southern Florida.

Since 1984, the Tribe has provided its members quarterly payments to help them live on the reservation without outside assistance.[4]  To fund these distributions, the Tribe taxes the "gross sales" made on the reservation as well as the rents from land and oil leases.  The Tribe collects this tax revenue in what it calls the "non-taxable distributable revenue" account ("NTDR").  Each quarter, the Tribe gathers and approves a distribution from the NTDR.  It divides the NTDR's

---

[4] The Bureau of Indian Affairs approved the Tribe's program to provide these payments on December 13, 1984.

balance by the number of tribal members and then writes a check to each member for her proportional share.

In 1995, when the Tribe began gaming activities, it imposed a "gross receipts tax" specifically on MIBG.[5]  The Tribe also collects this gaming tax in the NTDR for distribution.  In theory, therefore, the NTDR contains revenue from both gaming and non-gaming sources, all of which the Tribe distributes to its members.

The reality is that the lion's share of the revenue for the distributions comes from MIBG.  In the financial year ending on September 30, 2001, MIBG contributed $32,103,681 into the NTDR; the Tribe distributed $32,268,000 to its members that year.  This means that $164,319 originated from other sources.  Similarly, in 2002, MIBG paid $37,462,023 into the NTDR; the Tribe distributed a total of $36,335,300 that year, leaving an excess of $1,126,723 in gaming revenue.  As the numbers reveal, MIBG contributed the vast majority of the funds for distribution.  Despite this fact, the Tribe neither reported the distributions nor withheld federal taxes on them.

---

[5] The Tribe defined "gross receipts" to "include all amounts wagered and received by MIBG, all admission fees paid to MIBG, and all other monies received by MIBG from ancillary or supporting operations (including, but not limited to, food and beverage services, gift shop sales, and related commercial activities)."  MIBG was required to calculate and pay the gross receipts tax on the last day of each calendar month.

In 2001, Sally Jim, a member of the Tribe, received and cashed distribution checks on behalf of herself, her husband, and her two children.[6] The distributions totaled $272,000, which amounted to $68,000 per person. She also earned $25,990 through her employment at the tribal healthcare center in that year. Sally Jim neither filed a tax return in 2001 nor paid federal taxes on the distributions.

In September, 2004, because of Sally Jim's failure to file a tax return, the Government assessed taxes, penalties, and interest against her for the 2001 tax year. On December 31, 2012, after becoming aware of the distributions Sally Jim received from the Tribe, the Government assessed additional taxes, penalties, and interest against her. Sally Jim did not pay the assessments.

### B.

On July 1, 2014, the Government sought to reduce the assessments to a judgment in the District Court. In its one-count complaint, the Government alleged that Sally Jim failed to pay taxes and penalties of $267,237.18 for 2001.[7] The Tribe moved to intervene as of right under Federal Rule of Civil Procedure

---

[6] The Tribe has a matriarchal culture in which the distributions payments are made out to the matriarch of the household. The matriarch is expected to divvy the distributions between the household members. If the household has children, the matriarch is obligated to either use the children's distributions for their benefit or to save them until the children reach adulthood.

[7] In January 2015, after the IRS had commenced proceedings against Sally Jim, her attorney prepared her tax return for 2001. She signed and filed it on January 20, 2015. The return stated that the $272,000 she received in distribution payments in 2001 were non-taxable as Indian general welfare benefits under GWEA.

24(a).[8]  The District Court granted the motion after determining that a ruling could subject the Tribe to withholding and reporting requirements and affect its general welfare program.

Sally Jim and the Tribe answered the complaint and raised affirmative defenses.  They alleged that Sally Jim did not owe taxes on the distributions because they were exempt from taxation.  Their principal argument was that the distributions qualified as "Indian general welfare benefit[s]" under GWEA and therefore could not be taxed.[9]  26 U.S.C. § 139E(a).  In case this argument failed, Sally Jim alleged that the Government wrongly included the distributions of her household members in the assessment against her.  She also alleged that she should not be subject to penalties because she relied "upon the advice of Tribal officials as well as the representatives of the Bureau of Indian Affairs."

---

[8] Federal Rule of Civil Procedure 24(a) reads:

(a) Intervention of Right.  On timely motion, the court must permit anyone to intervene who:

(1) is given an unconditional right to intervene by a federal statute; or

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

[9] Sally Jim and the Tribe also alleged that the distributions did not come from the "net revenue" of MIBG and that the "[d]istributions are derived directly from the land, and thus are not subject to federal income taxation and reporting requirements."

The Government moved the District Court for summary judgment, arguing that GWEA did not exempt the payments from taxation.[10]  Specifically, the Government argued that GWEA is inapplicable to the distributions because Congress, through IGRA, specifically intended to tax distributions of gaming revenue.  Sally Jim and the Tribe, in a joint response, countered that a dispute of material fact existed on whether the distributions met the requirements to qualify as Indian general welfare benefits under GWEA.

The District Court granted summary judgment in part.  It held that pursuant to IGRA the "per capita distributions of gaming revenue remain taxable income, even if these distributions arguably promote the general welfare of a tribe."[11]  The District Court, however, denied summary judgment as to how much of the distributions came from sources other than gaming, which might render them eligible for an exemption as Indian general welfare benefits.

With respect to the tax assessments against Sally Jim, the District Court concluded that a genuine dispute of material fact existed regarding the extent of Sally Jim's tax liability because some of the checks she received were "made out to her husband and her daughter."  On tax penalties, the District Court held that

_____

[10] The Government further argued the distributions were not exempt as income from reservation lands and that Sally Jim was subject to tax penalties because she had not reasonably relied on the advice of a tax expert.

[11] The District Court also held that a gaming enterprise, like MIBG, does not directly derive income from the land and therefore does not have a tax exemption on that ground.

9

Sally Jim had not demonstrated reasonable cause for failing to timely file her tax return as to her salary.[12]  But the District Court denied summary judgment on whether Sally Jim was subject to penalties for failing to report and pay taxes on the tribal distributions because a dispute of material fact existed as to whether she reasonably relied on the advice of an attorney or statements made during tribal meetings.

The parties consented to a bench trial, which took place August 11–16, 2016.  In its opening statement and closing argument, the Government stressed that the distributions came solely from the gross receipts tax on MIBG, a gaming facility, and thus that GWEA could not apply to any portion of them.  As to the amount of the tax assessments against Sally Jim, the Government contended that Sally Jim "had discretion" to spend the distributions the Tribe made to the members of her household and therefore that she must pay federal taxes on them.  Lastly, the Government asserted that Sally Jim lacked reasonable cause for failing to pay taxes on the distributions because she never received advice from a tax expert.

Sally Jim and the Tribe, in their opening statements and closing arguments, made no effort to establish how much of the distributions came from a source other

---

[12] The District Court based this conclusion on Sally Jim's deposition testimony that she had "everything ready" but "just completely forgot to file that year."

10

than gaming activities.[13]  They insisted that Sally Jim could not be liable for the full assessment amount and that she reasonably relied on the advice of tribal officials and Dexter Lehtinen, the Tribe's general counsel in 2001.

After careful consideration of the evidence and arguments of the parties, the District Court set forth its findings of facts and conclusions of law in an order on August 19, 2016.  The District Court reiterated that "the Tribe's distributions, derived from gaming proceeds, are not exempted from federal taxation as general welfare payments or income from the land."  Because neither Sally Jim nor the Tribe "present[ed] any evidence identifying a specific percentage of the distributions derived from non-gaming sources," the District Court held that "no exemption from taxation applies to the income at issue in this case."  Moving to whether the Government correctly included the distributions of Sally Jim's household members in the assessment against her, the District Court held that she "exercised sufficient control over the full amount of tribal distributions she received" to be liable for taxes on them.[14]  Lastly, the District Court addressed

[13] They again raised the argument that the income from MIBG was tax exempt as directly derived from the land.

[14] In so holding, the District Court put weight on the fact that Sally Jim included the full $272,000 in distributions on the 2001 tax return she filed in 2015.  It found relevant that Sally Jim did not provide evidence of the trusts in which she allegedly placed her daughters' distribution checks and that Sally Jim admitted to spending all the money in one of her daughter's trust accounts on household expenses.  Lastly, with respect to her husband, the District Court determined that Sally Jim exercised sufficient control over his distribution because the Tribe "is a matriarchal society," meaning that "[p]ayments . . . to a male member of the Tribe

11

whether the Government could impose penalties on Sally Jim for failure to file a tax return and to pay taxes on the distributions.  The District Court ruled that Sally Jim lacked reasonable cause for this failure because she admittedly forgot to file the tax return and could not have reasonably relied on the statements of tribal leaders or Dexter Lehtinen.[15]

The District Court concluded that "final judgment will be entered . . . in favor of the United States of America and against Sally Jim."  It instructed the Government "to submit a proposed order of final judgment."  Complying with this instruction, the Government proposed language for an order entering judgment:

> In light of the Order Setting Forth Court's Findings of Fact and Conclusions of Law, it is ORDERED AND ADJUDGED that Judgment is entered in favor of the United States and against Defendant Sally Jim and Intervenor-Defendant Miccosukee Tribe of Indians of Florida.  Specifically, Sally Jim is liable to the United States in the amount of $278,758.83 as of April 9, 2015 for unpaid federal income taxes, penalties, and interest assessed against her for the 2001 Tax Year, plus statutory additions and interest that continue to accrue under 26 U.S.C. §§ 6621–6622.

The District Court adopted the Government's proposed language with minor alterations—and thus entered judgment against both Sally Jim and the Tribe and

---

who is married to a female member of the Tribe are generally made available to the female member."

[15] Specifically, the District Court opined that Sally Jim could not have relied on advice of the tribal leaders because she had not established that any of them were tax experts.  As to Dexter Lehtinen, the District Court credited his testimony that "(1) he never represented Jim or any other individual member of the Tribe; and (2) he never instructed Jim not to file her federal income tax returns, nor did he instruct her not to pay tax on the distributions she received from the NTDR account."

specified that Sally Jim was liable for the unpaid federal income taxes, penalties, and interest.

A few weeks later, the Tribe moved the District Court to alter and amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). The Tribe contended that the District Court erred by entering judgment against it. A district court, the Tribe contended, "cannot enter a judgment against a party when nothing during the course of the litigation or the trial indicated that judgment would be entered against that party." Because the record does not explain the "basis" of the judgment, the Tribe continued, the final judgment is "likely to lead to confusion regarding who is liable for the amount due and what impact, if any, the judgment has on the Tribe."

The District Court denied the Tribe's motion to alter and amend the judgment. In seeking to intervene, the District Court reasoned, the Tribe "expressly stated it had an interest in the . . . determination of whether its distribution payments were subject to federal taxation." At summary judgment, the District Court rejected Sally Jim and the Tribe's affirmative defenses and held that the distributions were subject to federal taxation—a holding that subjected the Tribe to reporting and withholding requirements on the distributions. The District

13

Court therefore ruled that the circumstances warranted entering judgment against the Tribe, an intervenor as of right with an interest at stake.[16]

Sally Jim and the Tribe filed notices of appeal, challenging the District Court's order granting the Government partial summary judgment, its findings of fact and conclusions of law, and its final judgment. The Tribe also appealed the denial of its motion to alter and amend the judgment.

## II.

In an attempt to avoid federal income taxation on the distributions, Sally Jim and the Tribe primarily raise one argument on appeal as to the tax status of the distributions.[17] They argue that the distributions qualify as "Indian general welfare

---

[16] As to any confusion caused by the final judgment, the District Court stated that the language of the final judgment "clearly states . . . only Jim is liable for monetary damages" and that the judgment as to the Tribe "simply relates" to the conclusion that "the Tribe's distributions are subject to federal income taxation."

[17] Sally Jim raises two alternative arguments, both of which lack merit. First, she argues that the distributions do not come from the "net revenue" of MIBG. This is the case, she contends, because the Tribe imposes a tax on MIBG, places the tax into the NTDR, and then distributes the NTDR balance each quarter. In other words, Sally Jim argues that the distributions aren't made directly from MIBG and therefore aren't subject to federal taxation. We decline this invitation to place form over substance in analyzing the taxability of the distributions. *Ocmulgee Fields, Inc. v. C.I.R.*, 613 F.3d 1360, 1368 (11th Cir. 2010) ("[A] basic maxim of tax law is that 'the substance of a transaction, rather than the form in which it is cast, ordinarily determines its tax consequences.'" (quoting *Swaim v. United States*, 651 F.2d 1066, 1069–70 (5th Cir. 1981))). IGRA subjects to federal taxation the per capita payments an Indian tribe makes to its members from gaming revenue, no matter the mechanisms devised to collect the revenue or administer the payments.

Second, Sally Jim contends that the income from MIBG derives from the land and is therefore tax exempt under 25 U.S.C. § 5506 and the Miccosukee Settlement Act of 1997, Pub. L. No. 105-83, 111 Stat. 1624 (1997). These statutes provide that the lands conveyed to Indian tribes by the Government are not taxable. To be tax exempt under such statutes, the income in question must "derive[] directly" from an Indian tribe's lands. *Squire v. Capoeman*, 351 U.S. 1,

14

benefit[s]" and therefore are not subject to federal income taxation.  26 U.S.C. § 139E(a).[18]  This argument presents a question of statutory interpretation: whether GWEA in effect amended IGRA.  We review this question *de novo*.  *United States v. Maupin*, 520 F.3d 1304, 1306 (11th Cir. 2008).

IGRA, enacted in 1988, imposes federal income taxes on the per capita payments an Indian tribe distributes from the net revenue of Indian gaming activities.  25 U.S.C. § 2710(b)(3).  It therefore imposes taxation in "a very specific situation," *Morton v. Mancari*, 417 U.S. 535, 550, 94 S. Ct. 2474, 2483 (1974).  GWEA, enacted in 2014,[19] provides a tax exemption "of general application"[20] for

---

9, 76 S. Ct. 611, 616 (1956).  MIBG, a casino, does not generate income from the use of reservation land or the resources of the land.  Rather, the income from MIBG comes from "investment in . . . improvements" on the land and "business activities related to those assets," namely gambling.  *Critzer v. United States*, 597 F.2d 708, 714 (Ct. Cl. 1979) (en banc); *see also Campbell v. Comm'r*, 164 F.3d 1140, 1142–43 (8th Cir. 1999).  It therefore does not derive directly from the land.  Neither the Miccosukee Settlement Act nor § 5506 exempts the income from MIBG from taxation under IGRA.

[18] Section 139E(a) provides that an Indian general welfare benefit is excluded from "gross income," 26 U.S.C. § 63(a), and therefore is not subject to federal income taxation.

[19] While enacted over a decade after tax year 2001, GWEA applies to the present case because Sally Jim did not file her 2001 tax return until 2015, meaning that the period of limitation provided in 26 U.S.C. § 6511(a) did not begin to run until 2015.  *See* GWEA, § 2(d)(1), 128 Stat. 1884 ("The amendments made by this section shall apply to taxable years for which the period of limitation on refund or credit under section 6511 of the Internal Revenue Code of 1986 has not expired.").

[20] *Morton*, 417 U.S. at 550, 94 S. Ct. at 2483.

15

Indian general welfare benefits,[21] without regard to the source of the income.  26 U.S.C. § 139E(b).

"Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of the enactment."  *Morton*, 417 U.S. at 550–51, 94 S. Ct. at 2483; *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S. Ct. 1989, 1992–93 (1976) ("It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.").  In enacting GWEA, Congress expressed no intent to release the per capita payments of gaming revenue from federal taxation.[22] Congress spoke clearly when it imposed federal income taxation on per capita payments derived from gaming revenue.  If Congress intended GWEA to undo this arrangement, it knew the words to do so.  It chose not to use them.  *See Animal*

---

[21] Provided, of course, that the payments in question meet the four requirements in the statute.  *See supra* note 2.

[22] To the contrary, the legislative history of GWEA suggests that Congress intended to codify and clarify Revenue Procedure 2014-35, 2014-26 I.R.B. 1110, which itself stated that "per capita payments to tribal members of tribal gaming revenues that are subject to the Indian Gaming Regulatory Act are . . . not excludable from gross income under the general welfare exclusion or this revenue procedure."  *See* Staff of Joint Comm. on Taxation, 113th Cong., General Explanation of Tax Legislation Enacted in the 113th Congress, at 40 (Comm. Print 2015) (stating that GWEA "contains similar requirements to Rev. Proc. 2014-35 in terms of which benefits would qualify for exclusion under the general welfare doctrine"); 160 Cong. Rec. E1469-02 (daily ed. Sept. 16, 2014) (statement of Rep. Tom Reed) (noting that GWEA "generally codifies" Revenue Procedure 2014-35); 160 Cong. Rec. H7601 (daily ed. Sept. 16, 2014) (statement of Rep. Nunes) (stating that GWEA "would codify [Revenue Procedure 2014-35], specifically applying the general welfare exclusion to Indian tribes and payments received by tribal members, their spouses and children").

*Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015)

("Where Congress knows how to say something but chooses not to, its silence is

controlling." (quotation omitted)).  We therefore hold that the exemption for

Indian general welfare benefits, 26 U.S.C. § 139E(a), is inapplicable to the per

capita payments an Indian tribe makes from gaming revenue.  The District Court

did not err in holding that GWEA does not exempt the distributions of MIBG's

revenue from federal taxation.[23]

## III.

Following trial, the District Court held that Sally Jim was subject to tax

penalties for failing to timely file a tax return and that she exercised sufficient

control over the distributions of her husband and children to be assessed taxes on

them.  The Tribe, in its initial brief on appeal, contended that the District Court

---

[23] This, of course, would not prevent the exemptions for general welfare benefits or income derived directly from the land from applying to funds in the NTDR that came from sources other than MIBG, assuming that Sally Jim and the Tribe could prove that the NTDR contained such funds.  The District Court correctly reserved that question for trial.  After trial, the District Court found that "[t]he vast majority, if not all, of the Tribe's distributions come from the Tribe's net gaming revenue" and that "[t]he Tribe produced no documentary evidence substantiating its claim that sources other than the Bingo Hall contributed to the NTDR account," *See United States v. White*, 466 F.3d 1241, 1248 (11th Cir. 2006) (stating that a civil defendant has the burden of proving a tax assessment erroneous after the Government proves that the assessment was properly made).  The District Court therefore held that none of the funds in the NTDR qualified for the exemptions for general welfare benefits or income directly derived from the land.  Neither Sally Jim nor the Tribe expressly challenged this determination in their briefs on appeal.  Even if they had, the evidence supports the District Court's finding that the great majority, if not all, of the distributions came from MIBG and therefore the District Court committed no error in this regard.

17

erred in reaching these conclusions.  Sally Jim, however, did not challenge the District Court's rulings on these matters in her brief.

"Under our caselaw, a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate.  Otherwise, the issue—even if properly preserved at trial—will be considered abandoned."  *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003); *see also Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("A party fails to adequately 'brief' a claim when he does not 'plainly and prominently' raise it, 'for instance by devoting a discrete section of his argument to those claims.'"  (quoting *Cole v. U.S. Attorney Gen.*, 712 F.3d 517, 530 (11th Cir. 2013))).  Accordingly, this Court refuses "to consider issues raised for the first time in an appellant's reply brief." *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004).

In her brief on appeal, Sally Jim challenged only the District Court's determination that the distributions were subject to federal income taxation.  In other words, Sally Jim bet the farm on the argument that the distributions were not taxable.[24]  She chose not to raise arguments as to penalties or the extent of her tax liability if we decided, as we do, that the distributions are subject to federal income

---

[24] Indeed, her brief argues only that the distributions do not originate from the "[n]et revenue" of a gaming facility, 25 U.S.C. § 2710(b)(3), or, in the alternative, that the distributions are exempt from federal income taxation as Indian general welfare benefits or income derived directly from the land.

18

taxation.[25]  We therefore need not address these issues because they have been waived.  The District Court's rulings on them stand.

## IV.

Lastly, the Tribe contends that the District Court erred by entering judgment against it and challenges the District Court's order denying its motion to amend the judgment.  "The decision to alter or amend judgment is committed to the sound discretion of the district judge and will not be overturned on appeal absent an abuse of discretion."  *Am. Home Assurance Co. v. Glenn Estess & Assocs., Inc.*, 763 F.2d 1237, 1238–39 (11th Cir. 1985).  We disagree with the Tribe.

It is hornbook law that an intervenor "is treated as . . . an original party and has equal standing with the original parties."  7C Charles Alan Wright, Arthur R.

---

[25] The Tribe contested these issues in its brief on appeal, and Sally Jim attempted to adopt them in her reply brief.  The Tribe, however, has no legal interest with respect to penalties leveled against Sally Jim or Sally Jim's tax liability for the distributions of her husband and children; it therefore could not raise those issues on appeal.  *See Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117, 1126 (2d Cir. 1983) ("[T]he sum of rights possessed by an intervenor, even if granted unconditional intervention, is not necessarily equivalent to that of a party in a case and depends upon the nature of the intervenor's interest."); 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1923 (3d ed. 2007) ("An appeal will be allowed . . . only to the extent of the interest that made it possible for intervention."); *cf. Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. —, 137 S. Ct. 1645, 1651 (2017) ("[A]n intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests."); *Boston Tow Boat Co. v. United States*, 321 U.S. 632, 634, 64 S. Ct. 776, 777 (1944) (holding that an intervenor could not establish violation of an "independent right" sufficient to support an "independent appeal").  Sally Jim also fails to avoid waiver by incorporating the Tribe's arguments in her reply brief; she brought these arguments "too late."  *Sapuppo*, 739 F.3d at 683.

19

Miller & Mary Kay Kane, Federal Practice and Procedure § 1920 (3d ed. 2007).[26]

Just as an original party, an intervenor is "vulnerable to complete adjudication by the federal court of the issues in litigation between the intervenor and the adverse party." *United States v. Oregon*, 657 F.2d 1009, 1014 (8th Cir. 1981) (quotation omitted). A district court may therefore enter judgment against an intervenor, the same as any original party.

Here, the Tribe intervened as of right regarding the tax status of its distribution payments. As the Tribe argued in its motion to intervene, the determination whether the distributions were subject to federal taxation would affect "the Tribe's ability to preserve the integrity of its general welfare system and governmental functions." If the distributions were determined to be taxable, the Tribe would have legal obligations in the form of reporting and withholding requirements.

As an intervenor, the Tribe entered the lawsuit with full knowledge of the Government's claims, and asserted affirmative defenses that were resolved by the District Court. It argued each motion, attended depositions, gave an opening

---

[26] *See Alvarado v. J.C. Penny Co., Inc.*, 997 F.2d 803, 805 (10th Cir. 1993); *Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985); *Marcaida v. Rascoe*, 569 F.2d 828, 831 (5th Cir. 1978); *cf. Ross v. Bernhard*, 396 U.S. 531, 541 n.15, 90 S. Ct. 733, 740 n.15 (1970) ("[W]hen intervention is permitted generally, the intervenor has a right to a jury trial on any legal issues he presents."); *Sutphen Estates v. United States*, 342 U.S. 19, 21, 72 S. Ct. 14, 16 (1951) ("There is intervention as of right under Rule 24[a][2] when . . . the applicant is or may be bound by a judgment in the action." (quotation omitted)).

statement and closing argument, examined witnesses, and produced evidence and testimony.  In other words, the Tribe not only had the status of an original party but acted like one.  The Tribe was also aware that, in its proposed conclusions of law, the Government asked the District Court to declare that the Tribe's distributions were subject to federal income taxation and therefore that the Tribe had an obligation to withhold taxes on them.  As a result, the District Court did not abuse its discretion in refusing to amend the judgment.[27]

    **AFFIRMED.**

---

[27] The Tribe's argument that the final judgment creates confusion has no merit.  The order clearly states that Sally Jim is liable for the tax assessment, not the Tribe.  There can be no confusion on that point.