[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12410
_____

D.C. No. 3:16-cr-00060-BJD-JRK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MATTHEW BRIAN CANIFF,

Defendant-Appellant.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(April 9, 2020)

Before NEWSOM, MARCUS, and EBEL,[*] Circuit Judges.

PER CURIAM:

_____

[*] The Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Upon reconsideration, this Court sua sponte **VACATES** its prior opinion, published at 916 F.3d 929 (11th Cir. 2019), and substitutes the following in its place.

In this direct criminal appeal, Defendant Matthew Caniff challenges his convictions for three federal child sex offenses.  After careful review of the record, and with the benefit of oral argument, we **REVERSE** Caniff's conviction under 18 U.S.C. § 2251(d)(1) and **AFFIRM** his convictions under § 2422(b) and § 2251(a).  In doing so, we hold, among other things, that Caniff's private, person-to-person text messages asking an individual he thought was a minor to send him sexually explicit pictures of herself cannot support a conviction for "mak[ing]" a "notice" to receive child pornography in violation of 18 U.S.C. § 2251(d)(1).

## I. BACKGROUND

The evidence at trial, viewed in the light most favorable to the jury's verdict, see United States v. Dixon, 901 F.3d 1322, 1335 (11th Cir. 2018), cert. denied sub nom. Portela v. United States, 139 S. Ct. 854 (2019), established the following: St. John's County, Florida law enforcement initiated an operation to locate individuals who have a sexual interest in children and who were willing to act on that interest.  As part of the operation, FBI Special Agent Abbigail Beccaccio posed as "Mandy," a thirteen-year-old girl, on "Whisper."  Whisper is an online website and cellphone application "that allows users to text or communicate anonymously with

2

other users." (Aplt. Br. 3.) Whisper's "terms of use" provide that "individuals who use Whisper must be at least 13 years of age . . . and that if you are between the ages of 13 and 18, that you should be supervised by a parent." (Doc. 79 at 35-36.)

On the afternoon of March 31, 2016, Agent Beccaccio posted on Whisper a photo of another FBI employee taken when that employee was in her early twenties. The FBI had "age regress[ed]" that photo to make the person in it look "more childlike and youthful." (Id. at 37-38.) The photo showed "Mandy" dressed in a heavy sweatshirt or coat worn over another shirt; Mandy was not dressed or posed in any sexually suggestive manner. Agent Beccaccio posted this picture with the words: "Spring Break! And I'm BORED!!!!!!" superimposed over the photo. (Gov't ex. 1.)

Caniff, a thirty-two-year-old pharmacy technician, responded, stating "Let's do something then," followed by a "winky smiling face." (Doc. 79 at 41, Gov't ex. 2 at 1.) Mandy asked if Caniff was on spring break too; he responded that he was "[t]otally off today." (Doc. 79 at 42-43; Gov't ex. 2 at 2.) Caniff wanted to "do something water related." (Gov't ex. 2 at 3.) Mandy asked Caniff if he was old enough to drive; Caniff said he was; Mandy responded: "Sweet!! I'm not old enough too [sic]." (Id. at 4.) Caniff then asked Mandy if she had a bikini and was

3

it cute.  (Id. at 5.)  Caniff soon agreed with Mandy to leave Whisper and instead text message each other.

Caniff and Mandy exchanged text messages the rest of that afternoon and evening.  Although Mandy told Caniff several times at the outset of their text messaging that she was thirteen years old, Caniff's text messages to Mandy turned sexual and eventually became quite explicit and graphic.  Caniff also sent Mandy several pictures of his penis and asked her to send him pictures of her genitalia and of her masturbating.  When Mandy asked if she could get in trouble, Caniff responded that "[t]he only one of us the [sic] could get in trouble would be me." (Gov't ex. 3 at 3.)  Eventually, Mandy agreed to have sex with Caniff.

Before driving an hour and a half to meet Mandy, who said she was home alone, Caniff asked Mandy if she was a cop.  She responded, "[l]ike 13 year old [sic] are cops!"  (Id. at 14.)  Caniff said Mandy "could be pretending to be 13." (Id.)  Mandy said she was not.  Mandy asked Caniff what he was bringing her; he said he had Xanax to share with her.  Fate almost intervened for Caniff when his car broke down on his drive to Mandy.  But he was able to get his car working again and arrived at Mandy's home at approximately 1:30 a.m. where he was arrested.

After his arrest, Caniff consented to agents searching his computer, cell phone and other electronic devices, as well as his vehicle.  Agents found only adult

pornography on Caniff's phone, and no child pornography anywhere. Caniff also gave agents information that would enable them to access his social media accounts; officers found nothing incriminating there, either. There was Xanax in Caniff's wallet, which Caniff said he found in the trash at the pharmacy where he worked.

After giving Caniff Miranda[1] warnings, officers interviewed him. During that interview, Caniff acknowledged that Mandy had told him she was thirteen, but he stated that on the Whisper "application, it says that you have to be at least 17 or 18 to download,[2] so I assumed that that was the age. I thought that there was some kind of role-playing going on." (Gov't ex. 27A at 5 (footnote added); see also id. at 9-10 ("I thought we were role-playing . . . because . . . the site says that you have to be an adult . . . , so I believe that you have to be an adult. . . . I assumed that she was role-playing. . . . I assumed that I wasn't meeting a juvenile.").)

The United States charged Caniff with three offenses: 1) attempting to entice a minor to engage in illegal sexual conduct, in violation of 18 U.S.C. § 2422(b); 2) advertising for child pornography, in violation of 18 U.S.C. § 2251(d)(1)(A) and (2)(B); and 3) attempted production of child pornography, in violation of 18 U.S.C. § 2251(a). For these federal offenses, a minor is defined as "any person under the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] As noted previously, Whisper only requires users to be thirteen years old or older. There is no evidence about how, or if, that age restriction is enforced.

5

age of eighteen years." 18 U.S.C. § 2256(1). Count 1 relied on Florida law, which defines a minor to be under sixteen years of age. These offenses required the Government to prove, not that there was an actual child victim, but that Caniff believed he was texting with a minor. See United States v. Rothenberg, 610 F.3d 621, 626 (11th Cir. 2010) (§ 2422(b)); United States v. Lee, 603 F.3d 904, 913 (11th Cir. 2010) (§ 2251(a)). At trial, Caniff's primary defense was that he believed he was, instead, communicating with an adult who was role playing as a thirteen-year-old. The jury rejected that defense and convicted Caniff of each of the three charged offenses. The district court imposed three concurrent fifteen-year sentences, followed by five years' supervised release.

## II. DISCUSSION

### A. Caniff's text messages requesting that Mandy send him sexually explicit photos cannot support an 18 U.S.C. § 2251(d)(1)(A) conviction for making a "notice" seeking to receive child pornography

Caniff challenges his Count 2 conviction for violating 18 U.S.C. § 2251(d)(1)(A) and (2)(B), which provides:

> **(d)(1)** Any person who, in a circumstance described in paragraph (2), <u>knowingly makes</u>, prints, or publishes, or causes to be made, printed, or published, <u>any notice or advertisement seeking</u> or offering—
>
>> **(A)** <u>to receive</u>, exchange, buy, produce, display, distribute, or reproduce, any visual depiction, if the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct;

. . . .

shall be punished as provided under subsection (e).

**(2)** The circumstance referred to in paragraph (1) is that—

. . . .

**(B)** such notice or advertisement is transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce <u>by any means</u> including by computer or mailed.

(Emphasis added.)

The trial court, without objection, used the statutory language to instruct the jurors that the Government had to prove beyond a reasonable doubt, among other elements, "that the defendant knowingly made, printed, or published or caused to be made, printed, or published any notice or advertisement," and "that such notice or advertisement sought or offered to receive . . . any visual depiction . . . that . . . involved . . . a minor child engaged in sexually explicit conduct." (Doc. 80 at 132-33.) The jurors deliberated for thirty minutes before they sent the court a question, inquiring: "What is the definition of the term 'notice' in Count Two, or should we determine that definition?" (Id. at 144.) The district court discussed the jury's question with counsel and then, without objection, responded to the jury: "You should determine the definition based upon the instructions you have." (Id. at 145.) The jury deliberated another half hour and then returned a verdict convicting Caniff of Count 2, as well as the other two

counts.

On appeal, Caniff contends that there was insufficient evidence for a reasonable jury to find that the text messages he sent just to Mandy asking her to send him sexually explicit photos of herself were a "notice or advertisement" for purposes of § 2251(d)(1).  We review that argument de novo.  See Dixon, 901 F.3d at 1335 (reviewing de novo whether evidence was sufficient to support conviction); see also United States v. Jim, 891 F.3d 1242, 1250-51 (11th Cir. 2018) (addressing statutory construction de novo), cert. denied, 139 S. Ct. 2637 (2019).

The parties agree that, because the statute does not define the terms "notice" or "advertisement," those terms must be given their ordinary or common, everyday meanings.  This is consistent with the approach taken by other circuits addressing similar questions under § 2251(d)(1), see, e.g., United States v. Gries, 877 F.3d 255, 260 (7th Cir. 2017); United States v. Franklin, 785 F.3d 1365, 1367-68 (10th Cir. 2015), as well as with the rules of statutory interpretation generally, see Sebelius v. Cloer, 569 U.S. 369, 376 (2013).

We begin with what we consider to be the easier question—namely, whether the ordinary meaning of the term "advertisement" is broad enough to encompass Caniff's private, person-to-person text messages.  We think it clear that it isn't.  Standard English-language dictionaries confirm what we all know to be true—that, at least as used in modern parlance, an "advertisement" entails a public, and

8

typically commercial, statement.  Webster's Second, for instance, defines

"advertisement" (in the only entry not marked either "[o]bs[olete]" or "[a]rchaic")

to mean "[a] public notice, esp. in some public print, as a newspaper, periodical,

book, poster, or handbill . . . ."  Webster's Second New International Dictionary 39

(1944).  Webster's Third echoes that definition, adding only that an advertisement

is typically "paid" and may also be disseminated "over radio or television."

Webster's Third New International Dictionary 31 (2002).  The Oxford English

Dictionary likewise defines "advertisement" (in its non-obsolete, non-archaic

sense) to mean "a public notice or announcement, now esp. one advertising goods

or services"—originally "on a placard, poster, etc., or in a journal or newspaper,"

and more recently "on a broadcast medium, [such] as radio, television, etc."

Advertisement, Oxford English Dictionary, www.oed.com/view/Entry/2978 (last

visited March 25, 2020).  In Black's, more of the same: "[a] commercial

solicitation"—"an item of published or transmitted matter made with the intention

of attracting clients or customers."  Black's Law Dictionary 65 (10th ed. 2009).

Caniff's text messages to Mandy were neither public nor commercial.  They were

private requests for sexually explicit material.  Accordingly, they were not

"advertisement[s]."

     The more difficult question, we think—and the question to which the lion's

share of our analysis is devoted—is whether the ordinary meaning of the term

"notice" can fairly be understood to encompass Caniff's private, person-to-person text messages. Dictionaries define "notice" in various ways. Some definitions suggest that the word is broad enough to capture purely private communications. Dictionary.com, for instance, suggests that "notice" can include targeted communications, defining the term simply to mean "a note, placard, or the like conveying information or a warning." Notice, Dictionary.com, www.dictionary.com/browse/notice (lasted visited March 25, 2020). Along the same lines, the Seventh Circuit noted in its opinion in Gries that Webster's Third defines "notice" to include a "warning or intimation of something," as does the New Oxford American Dictionary (3d ed. 2010). 877 F.3d at 260. And in its opinion in Franklin, the Tenth Circuit cited a host of definitions of "notice" taken from a different version of Webster's Third, observing that none of them required "a public component." 785 F.3d at 1368 (citing Webster's Third New International Dictionary 1544 (1993)).[3]

Other definitions, though, indicate that "notice" refers only to public communications. Webster's Second, for instance, defines "notice," as "[a] written or printed sign . . . communicating information or warning"—as in "to put a notice on a door." Webster's Second at 1669. So too Webster's Third: "a written or

---

[3] In Franklin, the Tenth Circuit, nevertheless, assumed for purposes of its analysis, without deciding, that 18 U.S.C. § 2251(d)(1)'s use of the term "notice" had a public component. 785 F.3d at 1369.

printed announcement or bulletin"—like "insert[ing] a [notice] in the newspaper." Webster's Third at 1544. And the OED: "[a] displayed sign or placard giving news or information" (such as, for example, "notices on the bulletin board at your grocery store, describing your product and giving a price") or "[a] short announcement or advertisement in a newspaper, magazine, etc." Notice, Oxford English Dictionary, www.oed.com/view/Entry/128591 (last visited March 25, 2020). And Black's, as well: "[a] written or printed announcement"—as in "the notice of sale was posted on the courthouse bulletin board." Black's Law Dictionary at 1227.

In the end, these contrasting dictionary definitions serve mainly to tee up the issue before us—namely, whether the word "notice," as used in § 2251(d)(1), refers only to public communications, or whether it is instead broad enough to encompass private, person-to-person text messages between two individuals. The definitions that we've cited demonstrate that either meaning is plausible. To help to determine which (if either) of these two competing interpretations is the better one, we turn to statutory context. See, e.g., Tyler v. Cain, 533 U.S. 656, 662 (2001) (emphasizing that courts should not "construe the meaning of statutory terms in a vacuum"); Deal v. United States, 508 U.S. 129, 132 (1993) (observing that the meaning of a statutory term should not be "determined in isolation," but instead "must be drawn from the context in which it is used").

11

Recall that, in relevant part, § 2251(d)(1) makes it a crime for anyone to "knowingly make[], print[], or publish[], or cause[] to be made, printed, or published, any notice or advertisement seeking or offering [child pornography]." In mining the context, we'll begin at the beginning—with the verb phrase "make[], print[], or publish[]." On its own, the term "make" would seem, on balance, to support an expansive interpretation of "notice"—one that could be read to cover purely private communications. Black's, for instance, defines "make" broadly as "caus[ing] (something) to exist," as in "to make a record." Black's Law Dictionary at 1099; see also Random House College Dictionary 808 (1982) ("to write or compose, as a poem"). Thus, as the Supreme Court has said, "[w]hen 'make' is paired with a noun expressing the action of a verb, the resulting phrase is 'approximately equivalent in sense' to that verb." Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011) (internal quotation marks omitted). In other words, on its face, "to make any notice" simply means "to notify"—a phrase that ostensibly includes both public and private forms of "notice."

For two reasons, though, we are reluctant to read the term "make[]"—and with it the phrase "make[] . . . any notice"—for all it might possibly be worth. First, the phrase "make[] . . . any notice" does not—at least "in [its] ordinary and usual sense," Caminetti v. United States, 242 U.S. 470, 485-86 (1917)—naturally signal the private-communication variant of the word "notice." When invoking the

12

person-to-person understanding, the average speaker of American English would typically refer to giving "notice": a utility company might give an individual customer "notice" that it is going to turn off the customer's service; an employee might give "notice" to his boss that he won't be at work tomorrow; and a parent might give "notice" to a child that if he doesn't turn down his music, there will be consequences. In none of these situations, however, would it be natural to think of the speaker "mak[ing]" a "notice"—it would be odd, for instance, to say that a landlord made "notice" to a tenant that he had to vacate the premises.

Second, we must contend with the words that follow "make[]"—"print[]" and "publish[]." Both of these terms clearly denote public communication. Webster's Second, for instance, defines "publish" to mean "[t]o make public announcement of" or "to make known to people in general"—or, alternatively, "[t]o bring before the public, as for sale or distribution." Webster's Second at 2005. Webster's Third similarly defines the term to mean "to declare publicly" or to "make generally known"—or, alternatively, "to call to the attention of the public: advertise," "to place before the public (as through a mass medium)," or to "disseminate." Webster's Third at 1837. "Print" is similar. The most pertinent definition in Webster's Second defines "print" to mean "[t]o publish a book, article, music, or the like," Webster's Second at 1967, and the successor in Webster's Third treats the term as a subset of publishing generally, defining it to

13

include "to publish in print"—as in "all the news that's fit to [print]," Webster's Third at 1803. On balance, then, we think that the context provided by the terms "print[]" and "publish[]" operates to cabin the meaning of the word "make[]" as used in § 2251(d)(1). The interpretive canon noscitur a sociis, after all, instructs that "words grouped in a list should be given related meanings." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012) (internal quotation marks omitted). Applying that rule here, the words "print[]" and "publish[]," which clearly contemplate only public communication, would seem to similarly limit the word "make[]."

When we shift our focus from the verb phrase "make[], print[], or publish[]" to its object—"any notice or advertisement"—we find contextual clues pointing in opposite directions. On one side of the ledger, there is the fact that § 2251(d)(1) uses the capacious term "any." Typically, when Congress intends to restrict the scope of a particular word, it introduces that word with a limiting adjective or adverb. See, e.g., Wisconsin Cent. Ltd. v. United States, 138 S. Ct. 2067, 2071-72 (2018). Accordingly, had Congress wanted to limit the word "notice" to mean only "public notice," it could easily have added the adjective "public." Instead, Congress did just the opposite: it modified "notice" with the encompassing adjective "any." See Gries, 877 F.3d at 260 ("The phrase 'any notice or advertisement' in § 2251(d) casts a wide net for this offense."). As we have often

14

had occasion to say, when interpreting a statute, "any" means "all." Merritt v.

Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997) ("[T]he adjective 'any' is

not ambiguous; it has a well-established meaning . . . .  Congress did not add any

language limiting the breadth of that word, so 'any' means all." (internal quotation

marks omitted)); see also Laperriere v. Vesta Ins. Grp., Inc., 526 F.3d 715, 726

(11th Cir. 2008) ("[T]he term 'any' in a statute has a 'broad,' 'powerful,' and

'expansive' meaning; it does not mean 'some' or 'all but a few,' but instead means

'all.'" (internal quotation marks omitted)).  Congress's use of "any" in

§ 2251(d)(1) obliges us to give the word "notice" the broadest interpretation that it

will reasonably bear.

There is, though, contextual evidence that cuts the other way—most notably,

Congress's juxtaposition of the terms "notice" and "advertisement."  As we've

already explained, see supra at 8-9, the word "advertisement" clearly connotes a

public communication.  Applying the noscitur a sociis canon—which, again, holds

that words grouped together should be given a similar meaning—would suggest

that "notice," too, should be limited to public communications.  Cf. Gustafson v.

Alloyd Co., 513 U.S. 561, 573-76 (1995) (interpreting the phrase

"any . . . communication" to refer only to public communications, in part because

the adjacent inclusion of the terms "notice, circular, [and] advertisement" made it

"apparent that the list refer[red] to documents of wide dissemination" (emphasis

15

added)).  Having said that, noscitur a sociis is no trump here, for two reasons.

First, some courts—including at least one interpreting § 2251(d)(1)—have posited

that that the canon is of limited utility where the statutory term whose meaning is

being sought is one of a group of only two, rather than one of three or more.  See,

e.g., Franklin, 785 F.3d at 1369 (rejecting application of noscitur a sociis to define

"advertisement" and "notice" under § 2251(d) because "a list of two words" is "too

short for the canon"); but cf. MBIA Ins. Corp. v. FDIC, 708 F.3d 234, 241-42, 245

(D.C. Cir. 2013) (declining to accept a party's argument that "a list of two words is

an inappropriate occasion for application of noscitur a sociis").  Second, for

noscitur a sociis to apply, "the terms must be conjoined in such a way as to indicate

that they have some quality in common."  Scalia & Garner, supra, at 196.  And

here, although the terms "notice" and "advertisement" undoubtedly share

similarities, Congress's decision to separate them by the disjunctive term "or"

might indicate that it intended their meanings to be different.  See Loughrin v.

United States, 573 U.S. 351, 357 (2014) (stating that the "ordinary use" of "or" "is

almost always disjunctive, that is, the words it connects are to be given separate

meanings").

    As our back-and-forth, tennis-match-ish analysis indicates, neither

dictionary definitions nor the traditional canons of statutory interpretation neatly

resolve the question we face here—whether, as used in 18 U.S.C. § 2251(d)(1), the

16

phrase "make[] . . . any notice" refers only to public communication, or instead is broad enough to encompass private, person-to-person texts messages between two individuals. To resolve this seemingly intractable ambiguity, therefore, we turn to a traditional interpretive tiebreaker: the rule of lenity. See United States v. Rivera, 884 F.2d 544, 546 (11th Cir. 1989) ("The rule of lenity is merely a canon of statutory construction.").

The rule of lenity holds that if at the end of the interpretive road—having exhausted the applicable semantic and contextual canons of interpretation, and thus "seiz[ed] everything from which aid can be derived," Ocasio v. United States, 136 S. Ct. 1423, 1434 n.8 (2016) (internal quotation marks omitted)—meaningful doubt remains about the application of a criminal statute to a defendant's conduct, then the doubt should be resolved in the defendant's favor. See Scalia & Garner, supra, at 296-302. The rule is born of the principle that the law "must speak 'in language that is clear and definite' if it is to render something a crime," United States v. Phifer, 909 F.3d 372, 383 (11th Cir. 2018) (quoting United States v. Bass, 404 U.S. 336, 347 (1971)), and serves the twin aims of (1) ensuring that the public is given a "fair warning" that punishment will follow when "a certain line is passed" and (2) preserving the "separation-of-powers doctrine, [which] requires [that] legislatures, not courts . . . define crimes," id.

We have serious doubts about whether the phrase "make[] . . . any notice" in

§ 2251(d)(1) is broad enough to cover the private, person-to-person text messages that Caniff sent—doubts that we find cannot be adequately resolved by reference to the traditional tools of statutory interpretation.  In this instance, therefore, the rule of lenity requires us to resolve our doubts in Caniff's favor.  Accordingly, we hold that 18 U.S.C. § 2251(d)(1)—and specifically, its prohibition against "knowingly mak[ing] . . . any notice . . . seeking or offering [child pornography]"—does not apply to a private text message sent from one individual to another.

We think it important to note that our interpretation does not, as the government warns, "thwart" 18 U.S.C. § 2251's "purpose."  (Aple. Br. 39.)  It may be true that Congress intended § 2251 to be a "comprehensive regulatory scheme" aimed at "criminalizing the receipt, distribution, sale, production, possession, solicitation and advertisement of child pornography."  United States v. Parton, 749 F.3d 1329, 1330 (11th Cir. 2014) (internal quotation marks omitted) (addressing § 2251(a)).  Noble as that purpose may be, though, we can't serve it by making one of that scheme's constituent provisions—§ 2251(d)(1)—say something it doesn't, or by ignoring an ambiguity within it that we think is inescapable.  See United States v. Wiltberger, 18 U.S. 76, 95-96 (1820) (Marshall, C.J.) (stating that "[t]he intention of the legislature is to be collected from the words they employ" and elaborating that "[t]o determine that a case is within the intention of a statute, its

18

language must authorise us to say so").

Nor does our interpretation, as the government insists, "circumvent federal law" by "creat[ing] a one-on-one advertisement exception for persons interested in child pornography." (Aple. Br. 39.)  Regardless of what we decide today about the scope of § 2251(d)(1), Title 18 gives the government ample—and clear— authority to punish those, like Caniff, who solicit child pornography through private text messages.  Perhaps most on point, 18 U.S.C. § 2251(a) prescribes a 15-years-to-life sentence for anyone "who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct."  That prohibition extends not only to those who solicit minors for sex, but also to those, like Caniff, who ask for nude photos—the surest proof being that Caniff was charged and convicted under § 2251(a) and that (as we will explain momentarily) we affirm that conviction today.  See also United States v. Mathis, 767 F.3d 1264, 1279-80 (11th Cir. 2014) (rejecting a sufficiency-of-the-evidence challenge to a § 2251(a) conviction of a defendant who sent a text message to a minor "offer[ing] to pay [the minor] for a picture of [his] genitalia" and "direct[ing the minor] to take sexually explicit pictures"), abrogated on other grounds by Lockhart v. United States, 136 S. Ct. 958, 961 (2016).

Then there's 18 U.S.C. § 2252(a)(2), which makes it a crime—punishable by

five to 40 years in prison—to "knowingly receive[] . . . any visual depiction" of a minor engaging in "sexually explicit conduct" by "using any means or facility of interstate or foreign commerce."  So too § 2252A(a)(2), which makes it a crime—also punishable by five to 40 years—to knowingly receive any "child pornography" that has been mailed or "using any means or facility of interstate or foreign commerce . . . by any means, including by computer."  Notably, wholly apart from the act of soliciting nude photos, § 2252(a)(2) and § 2252A allow the government to separately charge an individual if he receives pictures via "any means or facility of interstate or foreign commerce."

As these provisions (and the balance of our opinion) make clear, our interpretation of § 2251(d)(1) does not prevent or inhibit the government from prosecuting those who solicit child pornography through private text messages—far from it.[4]

\* \* \*

---

[4] We also reject the government's suggestion that our interpretation of § 2251(d)(1) departs from the approach taken by our sister circuits.  As the government notes, other courts have held that § 2251(d)(1) makes it a crime to post offers to buy and sell child pornography in computer "chat rooms."  See, e.g., United States v. Grovo, 826 F.3d 1207, 1211-12 (9th Cir. 2016) (messages visible to 40-45 people); Franklin, 785 F.3d at 1367 (messages visible to 108 people).  These decisions are perfectly consistent with the reasoning we have articulated here: Posts in chat rooms or to online message boards are just the contemporary successors to the signs, posters, and placards to which pre-internet dictionaries refer.  See supra at 10-11.  That an online message board might be password-protected does not make the "notice[s] or advertisement[s]" posted there any less public—it is merely the equivalent of a bulletin board in a college dorm that requires keycard access to enter.

Relying on the rule of lenity, we hold that there was insufficient evidence for the jury to find that Caniff's private, person-to-person text messages to "Mandy" requesting sexually explicit photos were "notice[s]" "ma[de]" within the meaning of 18 U.S.C. § 2251(d)(1).  Accordingly, we reverse Caniff's conviction on that ground.

## B.  There was sufficient evidence for a jury to find that Caniff believed Mandy was thirteen

Caniff next challenges his remaining two convictions, arguing that, in light of his defense that he believed that he was text messaging with an adult woman who was role playing the part of a thirteen-year-old, there was insufficient evidence for the jury to find that he believed he was texting a minor.[5]  "We review de novo the sufficiency of the evidence[,] . . . view[ing] the evidence in the light most favorable to the government and draw[ing] all reasonable inferences and credibility choices in favor of the jury's verdict."  Dixon, 901 F.3d at 1335 (internal quotation marks and citation omitted).

> We will not reverse unless no reasonable trier of fact could find guilt beyond a reasonable doubt.  It is not our function to make credibility choices or to pass upon the weight of the evidence.  Instead, we must sustain the verdict where there is a reasonable basis in the record for it.

United States v. Farley, 607 F.3d 1294, 1333 (11th Cir. 2010) (internal quotation

---

[5] Caniff raises this same challenge to his conviction under 18 U.S.C. § 2251(d)(1).  Because we reverse that conviction on other grounds, however, we needn't consider this argument.

21

marks and citations omitted).

There is a reasonable basis in this record to support the jury's finding that Caniff believed Mandy was a minor. During their exchange of text messages, Mandy expressly told Caniff several times that she was thirteen. See United States v. Rutgerson, 822 F.3d 1223, 1228-30, 1232-33 (11th Cir. 2016) (holding there was sufficient evidence for jury to find defendant believed he was electronically conversing with fifteen-year-old because she told him in her emails and text messages that she was fifteen); United States v. Yost, 479 F.3d 815, 819 (11th Cir. 2007) (per curiam) (holding there was sufficient evidence for jury to find that the defendant acted with specific intent to persuade a minor to engage in criminal sexual activity where "both girls told Yost they were under-age multiple times"). In addition, a jury could find that many of Mandy's text messages suggested that she was thirteen—being on spring break, not being old enough to drive, and being sexually inexperienced. Furthermore, there was nothing in their text messages that expressly or even inferentially suggested that Mandy was an adult or that either Caniff or Mandy were only role playing.

To be sure, there was some other evidence from Caniff after his arrest where he professed to believe Mandy was an adult who was role playing to be a minor—Caniff's statements to police, for example, during his interview immediately after his arrest—from which the jury could have found instead that Caniff thought

22

Mandy was an adult role playing as a thirteen-year-old. But at the very most, that sets up conflicting evidence. However, we must on this appeal take the evidence in the light most favorable to the government and ask only if there was enough, if that evidence was believed, to cause a reasonable jury to convict. In light of that, we must uphold Caniff's convictions. See Farley, 607 F.3d at 1300, 1333-34 (holding evidence was sufficient for trial court conducting bench trial to find that defendant who believed he was texting a mother about having sex with her and her ten-year-old daughter "was 'for real,' and to disbelieve his insistence at trial that it was all a fantasy"); Yost, 479 F.3d at 819 (holding there was sufficient evidence for jury to find that defendant had specific intent to persuade minor to engage in criminal sexual activity, despite his assertion that "he believed he was communicating with adult women role-playing as minors").

## C. The district court did not abuse its discretion in permitting Detective Greene's challenged testimony

Lastly, Caniff challenges Detective Greene's testimony regarding the contents of Caniff's cell phone. After Caniff's arrest, Detective Greene interviewed Caniff and searched his cell phone. On direct examination, the detective testified that on Caniff's cell phone he found pictures of a penis and the text messages that Caniff and Mandy exchanged. During cross-examination, defense counsel asked Detective Greene if he found anything else on Caniff's cell phone:

23

Q. . . . Other than that, there was nothing else in the phone of any evidentiary value, correct?

A. In reference to this case, no -- or, I mean --

Q. In reference to anything.

A. -- any other case that I knew of, yes.

Q. There was no other illegal activity - - even if that's illegal activity, there was no illegal activity in the phone, correct?

A. Correct.

Q. Okay.  There was no child pornography in his phone, correct?

A. Correct.

Q. There were no chats on his phone that were inappropriate or illegal, correct?

A. Correct.

Q. Okay.  The only thing found on his phone was adult pornography, correct?

A. To the best of my knowledge, yes.

Q. Okay.  And nothing illegal with what he had, correct?

A. Correct.

(Doc. 80 at 23.)  On redirect, the prosecutor asked:

Q. Okay.  Now [defense counsel] asked you if there was evidence of any -- I think she said there was no -- she said there was no evidence of any illegal activity in the phone.

Is it your understanding that the text messages are evidence of illegal activity that is what brings us here today?

24

A. Yes.

[Defense counsel]: Objection, Your Honor.  He's asking for an opinion.  That's the whole issue in this courtroom today.

THE COURT: Give me just a moment.

I'll overrule the objection.  You may answer the question, Detective.

THE WITNESS: Thank you.

I assumed aside from what we were here to discuss today, but yes, I found nothing else that was apparent -- apparently illegal in the phone outside of this.

BY [Prosecutor]:

Q. But you gathered the evidence of the text messages.

A. Yes.

Q. And based on the judge's ruling, you can answer.  Was that, in your opinion --

A. Yes.

Q. -- evidence of illegal activity.

A. Yes.

Q. And the same question for the photos of the penises that were sent to Agent Beccaccio.

Is it -- based on your training and --

[Defense counsel]: Your honor, same objection.

THE COURT: Same ruling.

25

BY [Prosecutor]:

Q. Based on your training as a law enforcement officer, did you deem those to be evidence of illegal activity?

A. Yes.

(Id. at 25-26.)

"We review the district court's evidentiary ruling[] for an abuse of discretion." United States v. Augustin, 661 F.3d 1105, 1123 (11th Cir. 2011) (per curiam). Caniff argues primarily that this testimony violated Federal Rule of Evididence 704(b), which "[i]n a criminal case," precludes an expert's "opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."[6] But Detective Greene was never offered or qualified as an expert witness. "[J]ust because a lay witness's position and experience could have qualified him for expert witness status does not mean that any testimony he gives at trial is considered 'expert testimony.' Lay witnesses may draw on their

---

[6] Rule 704 provides:

> **(a) In General – Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.
>
> **(b) Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

professional experiences to guide their opinions without necessarily being treated as expert witnesses." United States v. Jeri, 869 F.3d 1247, 1265 (11th Cir. 2017) (citation, internal quotation marks, alterations omitted) (holding police officer did not testify as expert even though his testimony "showed [his] familiarity with narcotics investigations and his experience interviewing drug couriers"), cert. denied, 138 S. Ct. 529 (2017).

Moreover, even if Detective Greene did give expert testimony, Rule704(b) only precludes an expert from "expressly stat[ing] a conclusion that the defendant did or did not have the requisite intent" and from stating "an opinion as to the defendant's state of mind at the time of the offense." Id. at 1266 (internal quotation marks omitted). But Rule 704(b) does not preclude even "expert testimony that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on this ultimate issue, and instead leaves this inference for the jury to draw." Augustin, 661 F.3d at 1123 (internal quotation marks and alteration omitted). Detective Greene's challenged testimony may be ambiguous, but it clearly did not expressly address Caniff's mental state. Detective Greene's testimony did not at all address whether Caniff believed Mandy was thirteen. Detective Greene, on rebuttal, testified only that he found "evidence of illegal activity" on the phone. Indeed, he did not even say what that evidence was or whether it related at all to Caniff's state of mind. "Evidence

27

of illegality" could as easily have referred to other elements of illegality other than the mens rea element.

But even if we could say that the district court abused its discretion in permitting Detective Greene's challenged testimony, any error was harmless because there is no "reasonable likelihood that it affected [Caniff's] substantial rights." Id. (internal quotation marks and alteration omitted). It was defense counsel, not the Government, who first asked the detective if there was "illegal activity" on the phone. The Government, on redirect, was merely attempting to clarify any confusion the detective's responses on cross-examination may have created, and to explain why he gathered the text messages as evidence. We cannot conclude the district court abused its discretion in admitting this testimony but even if the district court did so, any error was harmless.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** Caniff's conviction under 18 U.S.C. § 2251(d)(1) and **AFFIRM** his convictions under § 2422(b) and § 2251(a).

NEWSOM, Circuit Judge, concurring:

I concur in the Court's revised opinion. For reasons that I've already explained at length and needn't repeat here, I am convinced that 18 U.S.C. § 2251(d)(1) is best (if unfortunately) interpreted *not* to reach Caniff's conduct. It has always seemed pretty obvious to me that when Caniff sent private, person-to-person text messages requesting explicit photos, he didn't "make[]" a "notice" for them. *See United States v. Caniff*, 916 F.3d 929, 940–48 (11th Cir. 2019) (Newsom, J., concurring in part and dissenting in part). Having said that, because, at the very least, § 2251(d)(1) doesn't clearly cover Caniff's conduct, I am satisfied with the Court's lenity-based resolution.